**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

GROVES INCORPORATED,

               Plaintiff,

    vs.

R.C. BREMER MARKETING ASSOCIATES
INC., JOSEPH FALK, CHRISTOPHER
SOUCEK, DAVID REINKE, DAVID LUDWIG,
JEFFREY ALEXANDER, LISA FOX, CODY
GUNTER, KIMBERLY FALK, JESSICA
ROBKE, BRIAN BOND, RENN HOLLANDER,
THOMAS MARTIN, JULIANN O'TOOLE
CORDES, GREGG LADD, CHRISTOPHER
SHEPPARD and MIKE NOCHEVICH,

               Defendants.

Case No.: 22-cv-50154

## FIRST VERIFIED AMENDED COMPLAINT

Plaintiff Groves Incorporated ("Groves" or "Plaintiff"), by and through its attorneys Kaplan Papadakis & Gournis, P.C. and Graff Silverstein LLP, brings its Verified Amended Complaint against Defendants R.C. Bremer Marketing Associates Inc. ("R.C. Bremer" or "RCB"), Joseph Falk, Christopher Soucek, David Reinke, David Ludwig, Jeffrey Alexander, Lisa Fox, Cody Gunter, Kimberly Falk, Juliann O'Toole Cordes, Jessica Robke, Brian Bond, Gregg Ladd, Christopher Sheppard, and Mike Nochevich (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

1.     This matter arises from the Defendants' efforts to misappropriate and convert, Plaintiff's proprietary and confidential customer and potential customer data coupled with active engagement in a libelous and slanderous campaign to discredit Plaintiff in the marketplace, together with fraud and egregiously unfair competition against Plaintiff by the Defendants, for the

1

EXHIBIT 1

purpose of profiting to the detriment of Plaintiff. Plaintiff also brings claim pursuant to the Lanham Act as well as various additional state law claims as set forth below.

2.      Defendants did not merely divert generic customer lists or leads that they independently developed. Rather, Defendants, through their relationship with certain corporate officers and employees at Groves, engaged in an insidious scheme to misappropriate and divert proprietary data on existing Plaintiff's customers and prospective customers, including, but not limited to, Groves' product specifications, as well as data on existing Groves' customers and prospective customers. Groves' product specifications and data on existing Groves' customers and prospective customers, include, but is not limited to, credit, price lists, potential and existing products, lead times to supply products for particular customers, vendors, and needs and requirements of each individual customers, such as equipment needs of each individual customer, timing of equipment needs for each individual customer, and individualized price points and individualized pricing and invoicing arrangements needed for each individual customer, as well as discount structures with each particular distributor and end-user of Groves' products. ("Customer Needs and Requirements."). The Customer Needs and Requirements had not only been developed over the course of forty-two years in business but had been fastidiously and jealously maintained by Plaintiff within Plaintiff's heavily guarded customer databases and repositories.

3.      Such customer databases and repositories, are organized, searched, and sorted by, among other things, customer, and potential customer name, contact information, Groves' internal and external sales representatives for individualized Groves' customers and/or financial information (including, but not limited to sales, revenues, costs, and profits associated with individualized customers) related to Groves' customer base as well as Customer Needs and Requirements.

4.     Accordingly, such customer databases and repositories, do not just constitute a list of customers (albeit it is a grouping of customers and potential customers for Groves' product line), but a roadmap to Groves' customer, and potential customer intelligence.

5.     Because the Customer Needs and Requirements had been gathered through forty-two years in business relations with the fire safety industry, and thereafter, collected, culled, and organized into discrete searchable customer databases and repositories, the Customer Needs and Requirements constitute protectable trade secrets.

6.     Defendant R.C. Bremer, and their sales representatives, collectively, comprise a sales organization which, for a period of no less than twenty-five years, sold products for Plaintiff to varying territories of the United States. Ordinarily, R.C. Bremer if performing within the scope of its obligations – not in the manner described herein as to Groves – may be entitled to market rate commissions for soliciting orders and/or sales for manufacturers within the fire and safety industry.

7.     Despite their long and profitable, relationship with Plaintiff  whereby R.C. Bremer earned commissions, in recent years, R.C. Bremer chose to ingratiate themselves and induce certain corporate insiders of Plaintiff, including, but not limited to, Defendants Cordes and Sheppard (and, non-parties Brent Hostler and Tom Martin) to permit them access to Groves Customer Needs and Requirements for the benefit of Groves' most significant competitor, Circul-Air Corporation ("CAC").

8.     Ultimately, on or about December 2021, armed with the Customer Needs and Requirements, Defendants and non-party Hostler and Martin forged a relationship with CAC– *i.e.*, a manufacturer of fire safety products and Groves' primary competitor. At that time, remarkably, Martin had still been Groves VP of Sales and Marketing; Cordes had been Groves SVP of

Operations; Hostler had been Groves' President; Sheppard had been National Sales Manager; R.C. Bremer had been, and at all salient times up until the middle of March 2022, held itself out to be Groves' sales agent, inasmuch as Groves' was led to believe R.C Bremer acted on behalf of Groves to solicit customers and orders for Groves in various territories throughout the United States.

9. ██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████

10. However, up until on or about the middle of March 2022, RCB represented to Groves that was its sales agent; and RCB represented that it would diligently solicit sales of Groves' Product to Groves' existing and prospective customers located in the Territory; RCB further represented to Groves that it would only use Groves' Customer Needs and Requirements on behalf of and for the benefit of Groves. Because of Groves 25-year history of reliance on those exact **affirmative** representations, Groves reasonably believed that RCB had been fulfilling all such representations up until the middle of March 2022. But for those misrepresentations, Groves

would never have continued to rely upon RCB to render sales for it; would never have provided RCB with continued access to its Customer Needs and Requirements; and would have immediately sought to enjoin any use of such Customer Needs and Requirements.

11.     But RCB lied to Groves. While still under contract with Groves to act as its sales agent, RCB, *inter alia*, sought to introduce CAC to all Groves' customers with whom CAC did not have prior relationships (or, only marginal prior relationships); in order to cause those Groves customers to transfer their business from Groves to CAC by leveraging RCB's knowledge of Groves' Customer Needs and Requirements for the benefit of CAC; and to assist CAC in launching new product lines, including, but not limited to, storage systems and racking to compete with Groves.

12.     RCB used Groves' Customer Needs and Requirements to market, and sell, CAC products to the marketplace.

13.     RCB received a ███████ commission rate from CAC than that offered by Groves as well as, upon information and belief, annual and quarterly incentives. Said another way, RCB profited handsomely from its betrayal of Groves. Groves, for its part, did not know that its products were not only <u>not</u> being marketed by RCB, but that RCB was using Groves' Customer Needs and Requirements to market and sell CAC competitive products in the Territories to <u>all</u> Groves' customers.

14.     RCB's deceptions did not stop with Groves. By way of illustration, on or about February 10, 2022, RCB (along with CAC) created, edited and presented a PowerPoint presentation to a substantial distributor and former Groves' customer in order to have that customer shift its business from Groves to CAC (at a time when Groves believed RCB had still been its agent and had not contracted with CAC such that RCB could no longer solicit any business for

Groves). In that presentation, in a slide entitled Gear Storage/Racking and under a CAC logo, RCB and CAC displayed and represented a picture of Groves' design patented storage system. RCB, during the presentation, intentionally, and with knowledge that the picture had been of Groves' storage systems, misrepresented to the distributor that the storage system had been a CAC product. At no time, did anyone (particularly, RCB or CAC) have Groves' permission to display its storage system. Ultimately, RCB caused that distributor – on or about March 3, 2022 – to ███████████ ██████████████████████████████████████████.

15.     Because of the foregoing actions and attendant defamatory conduct (as discussed within), as well as certain egregious conduct by Defendant Cordes and Sheppard amounting to intentional violations of their fiduciary obligations to Groves as high-ranking Groves' officers, Groves has lost, collectively, millions of dollars of profits from distributors, such as: 911 Fleet & Fire Equipment, Air One Equipment, Inc., Alex Air Apparatus, Alexis Fire Equipment, MacQueen Emergency Group, Associated Fire Safety, Banner Fire Equipment, Clarey's Safety Equipment, Dinges Partner Group LLC, Donley Safety, Ed M. Feld Equipment Co., Fire Master Equipment Inc., Fire Safety USA Inc., Five Alarm Fire & Safety, Heiman Incorporated, Jefferson Fire and Safety, Phoenix Safety Outfitters, Pomasl Fire Equipment, Vogelpohl Fire Equipment, MES-Illinois, Sentinel Emergency Solutions, W.S. Darley & Company, Witmer Public Safety Group, the Public Safety Store, Apollo Fire Equipment, American Airworks, Dakota Fire Extinguishers, A.E.C. Fire & Safety, Columbus Supply, Conrad Fire Equipment, Danko Emergency Equipment, Fire Department Service and Supply Co., Fire Force Inc., Fire Service, Inc., First Due Supply Company, Fyr-Tek Inc., Grand Forks Fire Equipment, Hoosier Fire Equipment, John M. Ellsworth Co., Leo M Ellebracht Company, M&T Fire and Safety Inc., Oshkosh Fire & Police Equipment Inc., Conway Shield, The Fire House, Van Wert Fire Equipment, Weis Fire & Safety Equipment,

LLC, MES-Illinois, Warren Fire Equipment, Mars Supply, Midwest Storage Solutions Incorporated, Allied Fire Sales & Service, Hook & Ladder Fire Rescue Products, LLC, Heritage Fire Equipment, Allegiant Emergency Services, Five Alarm Fire & Safety, MacQueen Emergency Group, Great Lakes Specialty Equipment, and FireService Management LLC. Groves, similarly, incurred substantial damages related to the expense it incurred in relation to its need rehabilitate its brand and goodwill.

## **JURISDICTION**

16.     This Court has jurisdiction over Plaintiff's Defense of Trade Secrets Act claim pursuant to 28 U.S.C. § 1331.

17.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the remainder of Plaintiff's claims because these claims closely relate to the Plaintiff's Defense of Trade Secrets Act claim, having arisen from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because (i) Defendants do business in and are involved in the marketing and selling of products in Illinois, (ii) upon information and belief, many of Defendants' personnel are a residents of Illinois, (iii) Defendants worked with the Plaintiff in the State of Illinois for the purpose of obtaining Plaintiff's confidential information, and proprietary data, as discussed herein, (iv) the use of the misappropriated proprietary data, and confidential information originated in Illinois, and (v) substantial economic benefits have been conferred upon the Defendants because of the misappropriation, conversion, and other misuses, of transactions within the State of Illinois which economic benefits would otherwise have been conferred upon Plaintiff.

## **PARTIES**

19.     **Plaintiff** is a well-known wholesaler of certain equipment supporting the fire and safety industries. Groves has been a leader in that marketplace since 1980, building critical goodwill across the United States with certain distributors. Groves is a Woodstock, Illinois based corporation.

20.     Defendant R.C. Bremer is an Illinois corporation with a principal place of business in Wisconsin. Defendant R.C. Bremer is a Manufacturers' Representative selling Industrial Safety and Fire-Fighting Equipment.

21.     Defendant Joseph Falk is an owner of RCB and resides at 8200 65th Place, Kenosha, Wisconsin. As discussed above, and below, Mr. Falk participated in the misconduct detailed herein (particularly, violations of the Lanham Act and fraud as against Groves as well as the unauthorized use of Groves' Customer Needs and Requirements) and received pecuniary benefits, personally, because of his misconduct.

22.     Defendant Christopher Soucek is an employee of RCB and resides at 2381 Heather Ridge Drive, Normal, Illinois. Mr. Soucek knowingly participated in the misconduct detailed herein (particularly, by virtue of his unauthorized use of Groves' Customer Needs and Requirements without Groves' approval or consent in certain Territories as that term is defined herein) and received pecuniary benefits, personally, because of his misconduct.

23.     Defendant David Reinke is an employee of RCB and resides at N8998 Willow Road, Watertown, Wisconsin. Mr. Reinke knowingly participated in the misconduct detailed herein (particularly, by virtue of his unauthorized use of Groves' Customer Needs and Requirements without Groves' approval or consent in certain Territories as that term is defined herein) and received pecuniary benefits, personally, because of his misconduct.

24.     Defendant David Ludwig is an employee of RCB and resides, on information and belief, in Chicago, Illinois. Mr. Ludwig knowingly participated in the misconduct detailed herein (particularly, by virtue of his unauthorized use of Groves' Customer Needs and Requirements without Groves' approval or consent in certain Territories as that term is defined herein) and received pecuniary benefits, personally, because of his misconduct.

25.     Defendant Jeffrey Alexander is an employee of RCB and resides at 10519 Forest Hill Drive, Wexford, Pennsylvania. Mr. Alexander knowingly participated in the misconduct detailed herein (particularly, by virtue of his unauthorized use of Groves' Customer Needs and Requirements without Groves' approval or consent in certain Territories as that term is defined herein) and received pecuniary benefits, personally, because of his misconduct.

26.     Defendant Lisa Fox is an employee of RCB and resides at 13540 Lake Ridge Lane, Fishers, Indiana. Ms. Fox knowingly participated in the misconduct detailed herein (particularly, by virtue of his unauthorized use of Groves' Customer Needs and Requirements without Groves' approval or consent in certain Territories as that term is defined herein) and received pecuniary benefits, personally, because of his misconduct.

27.     Defendant Cody Gunter is an employee of RCB and resides at 7714 Keller Way, Crestwood, Kentucky. Mr. Gunter knowingly participated in the misconduct detailed herein (particularly, by virtue of his unauthorized use of Groves' Customer Needs and Requirements without Groves' approval or consent in certain Territories as that term is defined herein) and received pecuniary benefits, personally, because of his misconduct.

28.     Defendant Kimberly Falk is an employee of RCB and resides at 3851 20th Avenue South, Minneapolis, Minnesota. As discussed above, and below, Ms. Falk participated in the misconduct detailed herein (particularly, violations of the Lanham Act and fraud as against Groves

as well as the unauthorized use of Groves' Customer Needs and Requirements) and received pecuniary benefits, personally, because of his misconduct.

29.     Defendant Jessica Robke is an employee of RCB and resides at 2405 NW Osage Circle, Riverside, Missouri. Ms. Robke knowingly participated in the misconduct detailed herein (particularly, by virtue of her unauthorized use of Groves' Customer Needs and Requirements without Groves' approval or consent in certain Territories as that term is defined herein) and received pecuniary benefits, personally, because of her misconduct.

30.     Defendant Brian Bond is an employee of RCB and resides, on information and belief, in Indianola, Iowa. Mr. Bond knowingly participated in the misconduct detailed herein (particularly, by virtue of his unauthorized use of Groves' Customer Needs and Requirements without Groves' approval or consent in certain Territories as that term is defined herein) and received pecuniary benefits, personally, because of his misconduct.

31.     Defendant Gregg Ladd is an employee of RCB and resides at 15515 Sugar Bottom Road, Ste. Genevieve, Missouri. Mr. Ladd knowingly participated in the misconduct detailed herein (particularly, by virtue of his unauthorized use of Groves' Customer Needs and Requirements without Groves' approval or consent in certain Territories as that term is defined herein) and received pecuniary benefits, personally, because of his misconduct.

32.     Defendant Juliann O'Toole Cordes resides at 2752 Liberty Lakes, Wauconda, Illinois.

33.     Defendant Christopher Sheppard resides at 2007 Hemlock Drive, McEnery, Illinois.

34.     Defendant Mike Nochevich is an employee of RCB and resides at 4128 22nd Avenue, Kenosha, Wisconsin. Ms. Nochevich knowingly participated in the misconduct detailed

herein (particularly, by virtue of his unauthorized use of Groves' Customer Needs and Requirements without Groves' approval or consent in certain Territories as that term is defined herein) and received pecuniary benefits, personally, because of his misconduct.

35.     Defendants Joseph Falk, Christopher Soucek, David Reinke, David Ludwig, Jeffrey Alexander, Lisa Fox, Cody Gunter, Kimberly Falk, Jessica Robke, Brian Bond, Gregg Ladd, Thomas Martin, Juliann O'Toole Cordes, Renn Hollander, Christopher Sheppard and Mike Nochevich (collectively, "Individual Defendants") are individual defendants that participated actively in the scheme to misappropriate Plaintiff's Customer Needs and Requirements, from Woodstock, Illinois, and benefit from the Customer Needs and Requirements maintained within Woodstock, Illinois, as well as benefit from such Customer Needs and Requirements in Woodstock, Illinois to the detriment of Plaintiff in Woodstock, Illinois.

36.     Individual Defendants worked, at all relevant times, for the benefit, on behalf, and as employees, or agents, of R.C. Bremer.

37.     The scope of such agency *did not* extend to defamation, slander, tortious interference with contract, and/or misappropriation of trade secrets, and therefore, the Individual Defendants are liable for their participation, jointly and severally, for the misconduct asserted in this Complaint.

**FACTS COMMON TO ALL COUNTS**

I.      **GROVES' CUSTOMER NEEDS AND REQUIREMENTS CONSTITUTE TRADE SECRETS**

38.     Groves, an Illinois registered corporation, is a 42-year-old business selling equipment and storage solutions, personal protective equipment (PPE) and health and wellness equipment and products to the fire industry. During that time, Groves, through great effort and expense, developed and maintained, in strict confidence, Groves' Customer Needs and Requirements.

39.     The Customer Needs and Requirements had not only been developed over the course of forty-two years in business but had been fastidiously and jealously maintained by Plaintiff within Plaintiff's heavily guarded customer databases, and repositories.

40.     Such customer databases and repositories, are organized and searchable by, among other things, customer, and potential customer name, contact information, certain needs, and requirements, revenue and expense associated with each customer, profitability of each customer, products sold to each customer, sales to each customer, percentage of yearly revenues represented by each customer, and dates of sale of products to each customer.

41.     Accordingly, such customer databases and repositories, do not just constitute a list of customers (albeit it is a grouping of customers and potential customers for Groves' product line), but a roadmap to Groves' customer, and potential customer intelligence.

42.     Because the Customer Needs and Requirements had been gathered through forty-two years in business relations with the fire safety industry, and thereafter, collected, culled, and organized into discrete searchable customer databases and repositories, the Customer Needs and Requirements constitute protectable trade secrets.

43.     These confidential and proprietary assets have independent economic value.

44.     Defendants Sheppard and Cordes acknowledge in their countersigned copies of the Groves' Employee Handbook: "Employee understands and acknowledges that the Confidential

12

Information has been developed or obtained by the Company by the investment significant time, effort, and expense, and that the Confidential Information is a valuable, special and unique asset of the Company which provides Company with a significant competitive advantage and needs to be protected from improper disclosure."

45.     Thus, Groves' Customer Needs and Requirements constitute trade secrets.

**II.     GROVES ADEQUATELY SAFEGUARDS ITS CUSTOMER NEEDS AND REQUIREMENTS**

46.     Groves maintained the Customer Needs and Requirements in customer databases and repositories, which have been fastidiously and jealously protected from the marketplace by, among other things, IT and Cyber Security Policies.

47.     The customer databases and repositories, are double password protected, and persons using such customer databases and repositories are always supervised and bound by confidentiality agreements as well as restricted access procedures, which only permits access to that information reasonably necessary perform their function.

48.     Further, all access to the customer databases and repositories, are monitored by management, and outside third-party vendors. Moreover, Groves' Confidentiality Agreements and Employee Handbooks (as acknowledged and agreed to by all Groves' employees) prohibit disclosure of confidential information and/or retention of confidential information after cessation of employment with Groves.

49.     Therefore, Groves adequately safeguards its trade secrets.

**III.     GROVES CUSTOMER NEEDS AND REQUIREMENTS ARE CONFIDENTIAL AND PROPRIETARY**

50.     Within the fire and safety industry, and particularly within the nature of the relationship between R.C. Bremer, as a sales agent, on the one hand, and Groves, as a manufacturer on the other, R.C. Bremer had an obligation to maintain Groves' Customer Needs and Requirements in strict confidence.

51.     Moreover, industry customs and practices  mandate that a manufacturers' representative would not use and/or disclose information, such as Groves' Customer Needs and Requirements, received from a customer to Groves' competitors.

52.     Consistent with that industry custom and practice R.C. Bremer, in its Manufacturer's Sales Agent Agreement with CAC, recognized the **confidential and proprietary** nature of that information in the marketplace.

53.     ██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██ ███ █████ █████ ████ ██████ █████ ██ ██████ ██ ███

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████

54.     ██████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

55.     In addition to ordinary customs and standards within the industry, Groves and R.C. Bremer had communications about the manner and method by which Groves' Customer Needs and Requirements could be used, and disclosed, for the benefit of Groves, including, the persons and/or entities to whom that information could be disclosed.

56.     Specifically, Groves' personnel and R.C. Bremer personnel agreed that R.C. Bremer had the obligation to treat as strictly confidential all prices, price lists, discounts, customer lists, trade secrets, know how, technical data and other confidential information divulged or delivered to R.C. Bremer by Groves; to not disclose such information to others during their relationship, and upon termination of their relationship for any reason, to make no further use of such business information and to return to Groves all such business information within thirty (30) days, together with all reproductions or copies thereof which R.C. Bremer may have made or caused to be made.

57.     More specifically still, Groves and R.C. Bremer agreed that Groves' Customer Needs and Requirements would be disclosed to R.C. Bremer *only* if used on behalf of Groves and for the benefit of Groves, not for the benefit of any other person or entity.

58.     Groves' standard sales representative agreement required the manufacturer's representation to incur the obligation to treat as strictly confidential all prices, price lists, discounts, customer lists, trade secrets, know how, technical data and other confidential information divulged

or delivered to it by Groves; to not disclose such information to others during their relationship, and upon termination of their relationship for any reason, to make no further use of such business information and to return to Groves all such business information within thirty (30) days, together with all reproductions or copies thereof which it may have made or caused to be made.

59.     Groves' standard distributorship agreement required its distributors to agree to keep in strict confidence and not either directly, or indirectly, make known, divulge, reveal, furnish or make available to any other party any trade secrets or confidential or proprietary information of Groves, together with any technical data, trade secrets, drawings, know-how, or other confidential information belonging to Groves' customers, including but not limited to, formulas or processes, financial information, Groves unique selling methods and trade techniques, customer lists, manufacturing know-how, testing efficacy, data, all prices for the products, quotes for the products, price lists for the products, discounts, know-how, configuration tools, specifications, sales and marketing strategies and plans, technical data, and all tangible or intangible embodiments thereof of any kind whatsoever.

60.     Further, within Groves' Employee Handbook, executed by Martin, and Defendants Cordes and Sheppard: "Confidential Information includes without limitation: - business records and plans - customer lists and records - technical information - products and product pricing - computer programs and listings - other information including passwords and company procedures and operations and other proprietary information including client information" and "Upon termination, all… company property must be returned."

**IV.     TO BENEFIT THEMSELVES AND END GROVES AS A GOING CONCERN, DEFENDANTS ENGAGED IN MISAPPROPRIATION OF GROVES' CUSTOMER NEEDS AND REQUIREMENTS; THEY ALSO DEFRAUDED AND DEFAMED GROVES AND ENGAGED IN DECEPTIVE TRADE PRACTICES AND UNFAIR COMPETITION**

61.     On or about November 3, 2021, during negotiations of the CAC-R.C. Bremer Agreement that would consummate on December 20, 2021, CAC ordered myriad products that Groves offered to the marketplace, apparently, such that CAC and R.C. Bremer could, collectively, "mimic" such products and offer them to the marketplace. Remarkably, such products had been shipped to CAC at no cost. Upon information and belief, Groves' then-President Brent Hostler and Defendants Sheppard and Cordes, prepared that commercial invoice to assist RCB and CAC in copying Groves' product specifications and developing "copycat" products to sell to Groves' customers.

62.     As discussed within, Hostler and Cordes, during December 2021, resigned from Groves to join CAC as its President and VP of Operations, respectively (*i.e.*, CAC hired them in the same roles each had at Groves). Moreover, Defendant Sheppard left Groves at or around that same time to join CAC's owner in another business that competes with a Groves line of products (particularly, SNG Companies, LLC).

63.     Further, on or about November 24, 2021, just weeks before his resignation from Groves, Groves' then-President Brent Hostler shared 2022 projections for a major customer of Groves with RCB and non-party Martin, who, like Defendant Cordes and Hostler, resigned Groves in December 2021 to join CAC in January 2022 as CAC's VP of Marketing and Sales (*i.e.*, the same role he had at Groves). The purpose of that transmission, upon information and belief, had not been for the benefit of Groves, but so that RCB and CAC could collectively use that information to solicit that major Groves' customer.

64.     On or about December 6, 2021, CAC's owner text messaged RCB owner: "Looking forward to getting the distractions out of the way and Brent [Hostler] and I being able to focus on growth with current and new products. :-)! I definitely feel strongly that you and RC are a huge

17

part of this as well." RCB knew, and understood, that Hostler had been Groves' President at that time; that RCB would imminently become CAC's sales manufacturing representative; that RCB would be precluded from representing Groves as its sales representative pursuant to the contract it would execute with CAC; and, that CAC would be targeting Groves' customers, and officers.

65.     Later in that same text message, CAC confirmed that RCB received the proposed CAC-RCB Manufacturer's Sales Agent Agreement and that RCB received notice that it would be receiving a commission rate ████████████████ for a Sales Agent in the fire safety industry, along with annual and quarterly incentives, and a █████████████████████████ that Groves had paid RCB.

66.     Later still in that same text message exchange, RCB confirmed that it sent certain Groves' materials to CAC such that CAC could "mimic" them and discussed additional benefits that could be offered to cause customers to "switch" to CAC from Groves.

67.     On or about December 10, 2021, just days after CAC and RCB confirmed by text message Brent Hostler's involvement in their plan, Brent Hostler resigned as the President of Groves.

68.     Shockingly, on or about January 11, 2022, RCB indicated an understanding that Brent Hostler had become the President of CAC. As discussed below, many other Groves' high-ranking officers followed suit.

69.     On December 13, 2021, just days after Brent Hostler's resignation, Hostler communicated with RCB, and specifically, provided Groves' volume projections for a major distributor and customer of Groves. The purpose, upon information and belief, of that communication had been such that RCB could use that volume information to solicit orders / commitments from that same Groves' customer for, and on behalf of CAC, and to the exclusion

of Groves. Ultimately, as discussed within, in February 2022, RCB and CAC would provide identical volume projections as part of a pitch that ultimately "won" that now former Groves' customer.

70. CAC, thereafter, poached Groves' VP of Marketing and Sales (i.e., Martin), and Senior VP of Operations (i.e., Cordes). CAC, as discussed, according to RCB, had similarly, poached Groves President, Brent Hostler, who, according to RCB, on or about January 11, 2022, became CAC's President.

71. Specifically, on or about December 23, 2021, CAC emailed Cordes "now that you have left Groves," that CAC wants to hire her. At that time, Cordes still worked for Groves.

72. On December 25, 2021, while still working for Groves, Cordes executed her employment agreement with CAC.

73. On December 22, 2021, CAC offered, and Martin accepted, an employment contract with CAC.

74. At that time, Martin still worked for Groves.

75. At the time of their resignations and with knowledge that they were heading to perform their same function at CAC as they provided at Groves, Martin, Hostler, and Cordes, had (and abused) access to substantial information and retained that information after termination of their employment.

76. That information included, but was not limited to, Groves' systems generated listing of highest revenue producing customers; at a minimum, four years of all sales by Groves to their customer, sales price, and sales representative; Groves' revenue, cost, and profit from each customer for the entirety of 2021 for every single Groves' customer; years of information about dates of sales to customers; years of Groves' generated invoice numbers, sales orders, status of

19

customer orders and customers; Price Lists; Groves' Distributor Vetting Template; Groves' Credit Information Form. The information taken had been from Groves' internal searchable database.

77.     Ultimately, without Groves' approval, that information (possessed by Martin, Cordes, and Hostler because of Groves' trust and confidence in them while they worked for Groves) had been illicitly conveyed to RCB for the purpose of soliciting customers for CAC, not Groves.

78.     During that same month, December 2021, armed with the Customer Needs and Requirements, Defendants and non-party Hostler and Martin forged a relationship with CAC – *i.e.*, a manufacturer of fire safety products and Groves' primary competitor.

79.     R.C. Bremer had been, and at all salient times up until the middle of March 2022, held itself out to be Groves' sales agent.

80.     Groves was led to believe R.C Bremer acted on behalf of Groves to solicit customers and orders for Groves in various territories (including, but not limited to, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, West Virginia, Western Pennsylvania, and Wisconsin).

81.     Groves' Vice President of Marketing and Sales, in December 2021, had been told, explicitly, and repeatedly, by R.C. Bremer (particularly, Joseph Falk and others at R.C. Bremer) that R.C. Bremer had been authorized to act as Groves' sales agent; that RCB would diligently solicit orders of Groves' Product from Groves' existing and prospective customers located in the Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, West Virginia, West Pennsylvania, and Wisconsin; that R.C. Bremer would only use Groves' Customer Needs and Requirements on behalf of and for the benefit of Groves.

82.    Groves' President and Vice President of Sales, in January 2022, February 2022, as well as March 2022, had been told, explicitly, and repeatedly, by R.C. Bremer (particularly, Joseph Falk and others at R.C. Bremer) that R.C. Bremer had been authorized to act as Groves' sales agent; that RCB would diligently solicit orders of Groves' Product from Groves' existing and prospective customers located in the Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, West Virginia, West Pennsylvania, and Wisconsin; that R.C. Bremer would only use Groves' Customer Needs and Requirements on behalf of and for the benefit of Groves.

83.    ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

84.    ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

85.    However, up until on or about the middle of March 2022 (*i.e.*, in December 2021; January 2022; February 2022; and the beginning of March 2022), RCB systematically and consistently represented to Groves that it had been its sales agent; RCB represented that it would

diligently solicit sales of Groves' Product to Groves' existing and prospective customers located in the Territory; RCB further represented to Groves that it would only use Groves' Customer Needs and Requirements on behalf of and for the benefit of Groves.

86. Because of Groves 25-year history of reliance on those <u>exact</u> **affirmative** representations, Groves reasonably believed that RCB had been fulfilling all such representations up until the middle of March 2022. But for those misrepresentations, Groves would never have continued to rely upon RCB to solicit orders and sales on Groves' behalf; would never have provided RCB with continued access to its Customer Needs and Requirements; and would have immediately sought to enjoin any use of such Customer Needs and Requirements.

87. But RCB lied to Groves; RCB led Groves to believe it had still been its sales agent, when it was prohibited from so acting as its sales agent and required to solicit orders to Groves' biggest competitor.

88. While still under contract with Groves to act as its sales agent, RCB, *inter alia*, sought to introduce CAC to all Groves' customers with whom CAC did not have prior relationships (or, only marginal prior relationships); cause those Groves customers to transfer their business from Groves to CAC by leveraging RCB's knowledge of Groves' Customer Needs and Requirements for the benefit of CAC; and assist CAC in launching new product lines, including, but not limited to, storage systems and racking to compete with Groves.

89. On January 11, 2022 – while RCB still purported to be Groves' sales agent and had not disclosed its contract with CAC precluding RCB from acting as Groves' sales agent – RCB launched its plan to wrongfully divert Groves' clients from Groves to CAC.

90. In an email dated January 11, 2022, with the subject line "Target Accounts" CAC – through Groves' former Head of Sales and Marketing and newly appointed VP of Sales and

Marketing for CAC – wrote to RCB's Owner "Let's talk tomorrow on these accounts and plan to win them over (some or all?)." That email embedded a screenshot from Groves' internal system searchable system, sorted and filtered, with a list of 21 substantial Groves' customers. In response, CAC confirmed that many of such customers had never even been in CAC's system, and that "most of [the customers] [CAC had] not done much volume wise." In further response, **RCB wrote** "We need to lay out a plan on exactly who **_we_** want. Let's talk more about these accounts tomorrow."

91.     At no time, did RCB or anyone disclose the concerted effort to "target" Groves' significant customers using Groves' internal systems and Customer Needs and Requirements.

92.     Rather, Groves (from December 2021 through mid-March 2022) reasonably believed, as had been the case for the prior 25 years, that RCB had been soliciting customers to purchase Groves' products **from Groves** and had not been precluded from so by any collateral agreement, particularly, not an agreement with Groves' principal competitor.

93.     Nonetheless, throughout January 2022 and February 2022, RCB and CAC consistently had discussions and meetings among themselves and with customers on the "target list" to cause such customers to order CAC products to the exclusion of orders from Groves.

94.     During that same time, because RCB knew Groves' Customer Needs and Requirements and shared them with CAC without Groves consent or knowledge, RCB and CAC could offer "**copycat**" products to Groves' customers; offer those products at greater discount rates than Groves; and knew precisely the products that the customers needed and wanted as well as the amount of each product that each customer needed and wanted (*i.e.*, historical volume sales information to individualized customers as well as volume projections for individualized customers).

95.     During that same time, RCB similarly relayed information about conversations RCB had with Groves (or, its customers) concerning Groves' business dealings with CAC.

96.     RCB, in one exchange, went so far to share with CAC Groves' volume projections for a substantial customer that it received (as discussed above) from Brent Holster on or about December 13, 2021 (*i.e.*, three days after his resignation as President of Groves). CAC and RCB, thereafter, used identical volume projections as those provided from Hostler to RCB, to lure a Groves' customer from Groves to CAC.

97.     Said another way, RCB and CAC knew exactly what the customer needed because it unlawfully converted that information from Groves and used that information to offer the customer that volume of specific copycat products at a steeper discount than Groves – also, knowing Groves' discount rates from RCB.

98.     In another  remarkable correspondence, RCB requested if CAC could provide a "diamond" design for a storage system, and recognized, in writing, that such would be a rack that looks like Groves; and, in response, CAC responded "yes." In other correspondence, CAC and RCB went so far as to exchange a chart of Groves' products and comparable CAC "copycat" products, or that CAC intended to prepare in the future (*i.e.*, "coming Q4").

99.     But RCB did not stop at simple misappropriations and fraud. Rather, on or about February 2022, RCB and CAC, collectively, had myriad "pre-planning" meetings in anticipation of an in-person meeting with a significant Groves' customer that took place on February 10, 2022. During those pre-planning meetings, and *via* email exchange, CAC and RCB prepared a PowerPoint presentation.

100.    Between February 4, 2022 and February 6, 2022, RCB (along with CAC) created, and edited, a PowerPoint presentation that RCB and CAC ultimately presented, on February 10,

2022, to a substantial distributor and former Groves' customer to have that customer shift its business from Groves (at a time when Groves believed RCB had still been its agent and had not contracted with CAC such that RCB could no longer solicit any business for Groves).

101.    In that presentation, in a slide entitled Gear Storage/Racking and under a CAC logo, RCB and CAC displayed and represented a picture of Groves' patented storage system.

102.    RCB, during the presentation, intentionally, and with knowledge that the picture had been of Groves' storage systems, misrepresented to the distributor that the storage system had been a CAC product. In point of fact, CAC had <u>not</u> yet developed a storage system for sale to the marketplace.

103.    At no time, did anyone, particularly, not CAC and RCB, have Groves' permission to display its storage system and, particularly, not to represent that Groves' storage system had been a CAC product.

104.    Plaintiff's common law trade dress has acquired secondary meaning.

105.    Plaintiff has been exclusively using its common law trade dress of the cross-hatching pattern on its storage lockers since 2005.

106.    General public identify the Plaintiff's common law trade dress with Plaintiff's storage lockers.

107.    Plaintiff invested substantial amounts in advertising and promotional work for this mark.

108.    Ultimately, RCB caused that distributor – on or about March 3, 2022 – to ███████

████████████████████████████████████████████

109.    On or about March 7, 2022 – or, 4 days after ███████████████████

███████████████████████████ RCB and CAC exchanged text messages about

RCB's intention to finally terminate Groves. RCB wrote: "Meeting set with [Groves' President] – 3 PM central tomorrow!!"

110.    On that same date, March 7, 2022, in an email entitled "Launch Prep" CAC's Owner wrote to RCB's Owner "Joe, I have reviewed with Zach and Tom. We are pulling everything together that we discussed to have in one place for you to take to your distributors. We will pull it together by tomorrow morning." The "distributors" referenced had been Groves' customers.

111.    According to an email dated March 14, 2022, RCB's owner wrote Groves' then-President Robert Goldstein whereby RCB resigned as Groves' sales agent, claiming "This email is to inform you that RC Bremer Marketing will no longer be representing Groves, Inc. This is effective from our original conversation on Tuesday, March 8th. If you have any additional questions, please contact me on my cell phone."

112.    Prior to that email, Groves, had always believed that RCB had been acting on its behalf as its sales representative; had used its information for the exclusive benefit of Groves; ███ ████████████████████████████████████████████ had not been acting against Groves' interests; and, had not been colluding with Groves' competition, CAC, in an effort to harm Groves and benefit itself ███████████████████████████████.

113.    RCB used its knowledge of Groves' product specifications (as shared by, upon information and belief, Sheppard, Cordes, and Hostler in anticipation of their resignations from Groves) as well as pricing and discount rates for the benefit of CAC such that CAC could prepare "copycat" – or, as it called it "comparable" products – to the Groves' customers on the "target list" at a price point that they knew would be lower than Groves.

114. Such product specifications, prices, discounts, and Groves' Customer Needs and Requirements had <u>obviously</u> **not** been shared with RCB such that RCB could use such information against Groves and for the benefit of its competitor; but that is exactly what RCB did.

115. Said another way, RCB – while purporting to represent Groves as its sales agent – used knowledge that Groves shared with it, in confidence, and to be used for the exclusive benefit of Groves, exclusively for the benefit of CAC, and to the detriment of Groves.

116. To further its efforts to divert Groves' customers from Groves' products to CAC's "copycat" products for Groves' customers fire and safety needs – and to otherwise harm Groves in the marketplace and marginalize Groves (as CAC's principal competitor) – RCB engaged in a concerted pattern of defamation of Groves as soon as it terminated its relationship with Groves.

   a. On or about March 14, 2022, Jesse Moy had been contacted by Mark Skindelien at Alex Air Apparatus, by telephone and email. Mark Skindelien at Alex Air Apparatus communicated, by telephone, and email, that R.C. Bremer, at a trade show in Wisconsin, stated that "Groves was going out of business."

   b. On or about March 14, 2022, Jesse Moy had been contacted by Jim Phillips from WS Darley by telephone that R.C. Bremer had conveyed to him that Groves was going out of business.

   c. On or about March 11, 2022, Jesse Moy had been forwarded a correspondence received from Cody Gunter at R.C. Bremer by the Public Safety Store (*i.e.*, received by Brett Peterson), wherein Mr. Gunter wrote: "My company has decided to part ways with Groves after 30 years and move to Circul-Air (who makes Groves units). I know you all don't sell much of Groves but, I wanted to see if you'd be interested in a quick meeting next week to speak about Circul-Air. Maybe its something you

all would be interested in carrying. I also rep Tempest, Leatherhead, and others if you have questions on them." This drew a follow-up call via telephone from Jesse Moy to Public Safety Store, particularly Brett Peterson, during which Brett Peterson at Public Safety Store communicated that R.C. Bremer informed him that Groves had been "headed for bankruptcy" and would be unable to continue to service Public Safety Store accounts.

d.  On or about March 17, 2022, Jesse Moy had a conversation with Jim Steele at Kaza Fire Equipment, during which he stated explicitly, that he had been advised by R.C. Bremer that Groves is "going out of business," that "former employees of Groves are now all working for Circul-Air," that "Groves off brand cheap extractor is inferior to the extractors Circul-Air offers" and that "when Groves' contract with Pacific Helmets expires, Circul-Air will be picking up the line to meet that master distributor's needs."

e.  On or about May 13, 2022, Jesse Moy was contacted by personnel at Hoosier Fire Equipment who stated via telephone R.C. Bremer informed that personnel at Hoosier Fire Equipment not to sell Groves anymore and rather should divert its business to Circul-Air.

f.  On or about March 10, 2022, Blake Bergloff had been contracted by Joseph Levey at Air One Equipment Inc. via telephone that R.C. Bremer conveyed to Air One Equipment Inc. that Groves had been "financially insolvent," "operationally disoriented," and "going out of business."

g.  Upon information and belief, on or about March 2022 and April 2022, Defendant Cordes echoed many of the foregoing statements, including, but not limited to, that

Groves had been financially insolvent; operationally disoriented; and "going out of business." Cordes issued such statements verbally to myriad distributors on the "Target List" and made those same statements, as well as statements that Groves "failed to maintain a capable sales force" and that Groves "did not maintain sufficient product inventory" on or about January 2022 and February 2022 to Groves' substantial supplier of detergent and surface cleaner, who, ultimately, terminated its relationship with Groves.

h. Upon information and belief, on or about April 2022, and then again in June 2022, Defendant Sheppard made statements, including, but not limited to, Groves had been financially insolvent; operationally disoriented; and "going out of business." Such statements had been made to myriad Groves' customers (including, but not limited to, Groves' glass and stone distributors). Such statements, as discussed below, had been made for the purpose of diversion of Groves' glass and stone business to a newly formed business, SNG Companies, LLC, for which Sheppard had been a manager.

117. Because of the foregoing scheme, Groves presently can state that it lost significant sales from the following customers, during the period between the year-end 2021 to year-end 2022: 911 Fleet & Fire Equipment, Air One Equipment, Inc., Alex Air Apparatus, Alexis Fire Equipment, MacQueen Emergency Group, Associated Fire Safety, Banner Fire Equipment, Clarey's Safety Equipment, Dinges Partner Group LLC, Donley Safety, Ed M. Feld Equipment Co., Fire Master Equipment Inc., Fire Safety USA Inc., Five Alarm Fire & Safety, Heiman Incorporated, Jefferson Fire and Safety, Phoenix Safety Outfitters, Pomasl Fire Equipment, Vogelpohl Fire Equipment, MES-Illinois, Sentinel Emergency Solutions, W.S. Darley &

Company, Witmer Public Safety Group, the Public Safety Store, Apollo Fire Equipment, American Airworks, Dakota Fire Extinguishers, A.E.C. Fire & Safety, Columbus Supply, Conrad Fire Equipment, Danko Emergency Equipment, Fire Department Service and Supply Co., Fire Force Inc., Fire Service, Inc., First Due Supply Company, Fyr-Tek Inc., Grand Forks Fire Equipment, Hoosier Fire Equipment, John M. Ellsworth Co., Leo M Ellebracht Company, M&T Fire and Safety Inc., Oshkosh Fire & Police Equipment Inc., Conway Shield, The Fire House, Van Wert Fire Equipment, Weis Fire & Safety Equipment, LLC, MES-Illinois, Warren Fire Equipment, Mars Supply, Midwest Storage Solutions Incorporated, Allied Fire Sales & Service, Hook & Ladder Fire Rescue Products, LLC, Heritage Fire Equipment, Allegiant Emergency Services, Five Alarm Fire & Safety, MacQueen Emergency Group, Great Lakes Specialty Equipment, and FireService Management LLC.

## V.   CORDES' FURTHER VIOLATIONS OF LAW

118.    Defendant Cordes executed the Groves' Employee Handbooks, which reads: "Groves Incorporated requires that an employee's activities and conduct away from the job must not compete with, conflict with, or in any other way compromise company interests or adversely affect an employee's job performance and the ability to fulfill all job responsibilities. Groves Incorporated considers itself your primary employer and requires you to devote full attention to your job each workday" and ""Upon termination, all… company property must be returned." Nonetheless, Cordes secretly failed to comply with both.

119.    Most obviously, as discussed above, Cordes retained substantial Groves' corporate documentation after her December 2022 resignation, which she produced in connection with this litigation.

120.    But perhaps more insidiously, Cordes, secretly colluded with Hostler to evade Groves' corporate board resolutions and decisions. Particularly, Groves and Hostler ignored a board resolution that prohibited the purchase, either on behalf of Groves or as individuals, a certain supplier of detergents and surface cleaners.

121.    After the board denied Cordes and Brent Hostler, the right to pursue the opportunity on behalf of Groves, and, similarly, denied them the right to pursue the opportunity, in their individual capacity, Defendant Cordes, upon information and belief, worked with Hostler to help him evaluate and purchase an equity stake in that same detergent and surface cleaner company.

122.    Defendant Cordes undertook that work (and had been paid for it) at the same time she had been operating as an officer for Groves.

123.    Not only had the work done in relation to that purchase been expressly forbidden by Groves' board and management, but it violated her obligations as an officer to Groves because it interfered with her work schedule for Groves in 2021.

124.    Remarkably, on or about February 2022, that same detergent and surface cleaner company, terminated its relationship with Groves and commenced a relationship with CAC – the same company that Holster and Cordes worked for starting in January 2022.

125.    CAC, therefore, on or about February 2022, offered the detergents with its appliances and the surface cleaners in connection with myriad products. Groves, on the other hand, lost the ability to provide that synergy to its customers.

126.    Upon information and belief, Defendant Cordes in connection with RCB tortiously induced that surface cleaner and detergent company to terminate their relationship with Groves and commence a relationship with CAC, where, at the time of termination, she had been the SVP of Operations.

31

127.    Ultimately, CAC, in relation to its March 3, 2022, 

128.    Upon information and belief, Defendant Cordes, therefore, had been instrumental in a scheme to cause Groves to lose a critical supplier and cause that supplier to commence a relationship with CAC, the company that she intended to join as the VP of Operation in 2022. Nonetheless, she positioned herself to do so during 2021 by leveraging a relationship with that detergent and surface cleaner company; causing that company to terminate Groves; violating Groves' rules and board resolutions; placing Hostler in a position of power with that company; and causing that company to commence a new relationship with CAC once she arrived as the VP of Operations at CAC, such that CAC could have a competitive advantage over Groves.

## VI.    SHEPPARD'S FURTHER VIOLATIONS OF FIDUCIARY OBLIGATIONS

129.    Sheppard, for his part, violated his obligations because he commenced a competitive business with certain individuals involved in the overall scheme described herein to compete with Groves' stone and glass line.

130.    He commenced that competitive business without the permission of Groves management and in violation of Groves' Employee Handbook.

131.    Particularly, he formally joined, as the registered manager, of SNG Companies, LLC – an entity owned by CAC personnel.

132.    Prior to his resignation from Groves on March 4, 2022, Sheppard, upon information and belief, had been engaged in substantial work to formulate SNG Companies, LLC.

133.    The intention of all that work by Sheppard – while he had been being paid, and the National Sales Manager for Groves – had been to launch a competitive business in connection with CAC's Owner, other CAC employees, and former Groves' employee Jim Charles.

134.    Moreover, Sheppard, upon information and belief, misrepresented an affiliation with Groves using personal email account, particularly, Sheppard.Groves@gmail.com. And, apparently, did so in relation to competitive business to Groves (as well as for myriad other improper purposes during the time that he worked as Groves' National Sales Manager).

135.    Sheppard has refused to provide any documentation in response to discovery in this matter since its inception and, upon information and belief, is concealing that information.

**COUNT ONE**

**(Federal Misappropriation of Trade Secrets)**

**(18     U.S.C. § 1839): All Defendants**

136.    Plaintiff repeats and realleges each allegation contained in the prior paragraphs of this Complaint as if fully set forth at length herein.

137.    The actions of Defendant, as set forth herein, constitutes misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1839.

138.    Plaintiff possessed confidential information, including but not limited to, the Customer Needs and Requirements that constituted trade secrets.

139.    Such information is used in connection with Plaintiff's products and services which are offered across the country and is central to Plaintiff's business viability.

140.    Plaintiff took reasonable measures to maintain the secrecy and confidentiality of the Plaintiff's confidential and proprietary assets by instituting technology systems and policies to

safeguard against conversion, unauthorized access, use, duplication, or reverse engineering. Such information cannot be publicly acquired or duplicated because of the limited number of individuals who can access the information, and the contractual limitations imposed on such individuals.

141.    The Plaintiff's confidential and proprietary assets at issue were not generic lists or compilations of publicly available data, but rather proprietary data developed by proprietary channels. As such, this information is extremely valuable to Plaintiff, critical to the operation of Plaintiff's business, and, if available to others, would enable them to compete with Plaintiff to Plaintiff's detriment.

142.    Defendants knowingly and improperly obtained and disclosed the Plaintiff's confidential and proprietary assets in violation of the agreement and understanding with Plaintiff, duties to Plaintiff, and under the applicable laws, rules and regulations and industry standards and norms.

143.    Defendants used improper means to acquire knowledge of the Plaintiff's confidential and proprietary assets.

144.    Defendants' conduct constitutes knowing, willful, and malicious misappropriation.

145.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, Defendants will cause further irreparable injury to Plaintiff.

146.    Plaintiff is entitled to injunctive relief enjoining Defendant, its agents and employees, and all persons acting in concert or participation with it, from engaging in any further use of Plaintiff's proprietary and confidential information and trade secrets.

147.    As a result of Defendants' actions, Plaintiff has suffered direct and consequential damages, and is entitled to recover compensatory damages, including opportunity costs and enhanced damages in an amount to be proven at trial.

**COUNT TWO**

**(Illinois Trade Secrets Act 765 ILCS 1065): All Defendants**

148.    Plaintiff repeats and realleges each allegation contained in the prior paragraphs of this Complaint as if fully set forth at length herein.

149.    Without Plaintiff's consent and in violation of the Illinois Trade Secret Act, 765 Ill. Comp. Stat 1065/1, et. seq., Defendants have misappropriated the Customer Needs and Requirements, although Defendants have been obligated to maintain the secrecy of this information.

150.    Defendants were exposed to, had knowledge concerning and compiled information about Plaintiff and Plaintiff's customers, including Customer Needs and Requirements, from which Plaintiff derived significant economic and competitive advantages.   These Plaintiff's confidential and proprietary assets have independent economic value.

151.    By virtue of Defendants' business relationship with Plaintiff, Defendants acquired access to assets under circumstances giving rise to a duty to maintain the secrecy of such information.

152.    Defendants owed a duty to refrain from using the Plaintiff's confidential and proprietary assets in a manner adverse to the interests of Plaintiff.

153.    In spite of this duty, Defendants have misappropriated and/or used the Plaintiff's

confidential and proprietary assets including, but not limited to, customer lists, and proprietary customer information, and further misappropriated such Plaintiff's confidential and proprietary assets by, upon information and belief, making such Plaintiff's confidential and proprietary assets available to third-parties, including CAC.

154.    Such misappropriation by Defendants occurred during, and after, the time that it had a business relationship with Plaintiff and had been done for the express benefit of Defendants.

155.    Such misappropriation of these Plaintiff's confidential and proprietary assets were done without Plaintiff's consent, or permission.

156.    In violation of the Act, Defendants have disclosed and/or used (for the benefit of itself) the Plaintiff's confidential and proprietary assets to contact, broker, solicit, and/or submit proposals for Plaintiff's customers, and for customers Defendants worked with or had knowledge of while serving as Plaintiff's Sales Representative and/or officers.

157.    By soliciting Plaintiff's customers and using their Plaintiff's confidential and proprietary assets for the economic benefit of itself, Plaintiff used the Plaintiff's confidential and proprietary assets in the manner adverse to the best interests of Plaintiff, all in violation of the Act.

158.    Defendants willfully and maliciously misappropriated Plaintiff's confidential and proprietary assets in violation of the Act.

159.    As a direct, proximate, and intended and/or inevitable result of the actions of the Defendant, Plaintiff will suffer irreparable harm if Defendants are not enjoined from continued use of Plaintiff's confidential and proprietary assets.

160.    Because of the irreparable nature of the harm to Plaintiff, the most adequate remedy is a Court Order (i) enjoining Defendants from further soliciting, interfering, or entering any contracts with any of Plaintiff's customers for a period of two years, and (ii) enjoining from using

any of Plaintiff's confidential and proprietary assets for any reason.

161.     As a direct, proximate, and intended and/or inevitable result of Defendants' ongoing actions in violation of the Act, Plaintiff has suffered lost future and past profits, lost corporate opportunities, and past, present, and future injury to its goodwill and has been damaged in an amount to be determined at trial.

162.     Thus, Plaintiff is also entitled to all other damages or remedies available to it, including but not limited to, exemplary damages in twice the amount of the award and attorney's fees to the full extent of the law because of Defendants' knowing, willful, malicious and intentional conduct.

163.     Plaintiff is also entitled to damages reflecting the amount that Defendants has been unjustly enriched by the misappropriation of Plaintiff's confidential information and proprietary Plaintiff's confidential and proprietary assets.

## COUNT THREE

**(Unjust Enrichment): All Defendants**

164.     Plaintiff repeats and re-alleges each of the factual allegations set forth in this Complaint as if set forth herein.

165.     Through their unauthorized use, disclosure, and retention of the Plaintiff's proprietary assets, including, but not limited to, customer requirements, Defendants received significant benefits at the expense of Plaintiff.

166.     Because Defendants did not bargain for or otherwise compensate Plaintiff for the proprietary Plaintiff's confidential and proprietary assets, which were developed by Plaintiff at its expense, Defendants have been unjustly enriched. It would be unjust for Defendants to retain the

benefit of the proprietary Plaintiff's confidential and proprietary assets without paying to Plaintiff the value of the benefit conferred.

### COUNT FOUR

### (Injunctive Relief): All Defendants

167.    Plaintiff repeats and re-alleges each of the factual allegations set forth in this Complaint as if set forth herein.

168.    Plaintiff seeks a preliminary and permanent injunction barring Defendants from using and disclosing Plaintiff's confidential and proprietary assets to any third-party.

169.    Defendants' unauthorized use and disclosure of Plaintiff's confidential and proprietary assets, among other things, constitutes misappropriation of trade secrets under the Defense of Trade Secrets Act.

170.    Defendants' activities threaten Plaintiff with immediate and irreparable harm in that Defendants' continued use and disclosure of Plaintiff's confidential and proprietary assets will diminish the value of this information and Plaintiff's investment therein, and cause Plaintiff to suffer a loss of business. For Plaintiff to be made whole, Plaintiff must regain the exclusive use of its Plaintiff's confidential and proprietary assets, proprietary documents and confidential information, which form the basis of its competitive edge in the marketplace.

### COUNT FIVE

### (Tortious Inducement of Breach of Fiduciary Duty and Duty of Loyalty):  R.C. Bremer

171.     Plaintiff repeats and re-alleges each and every factual allegation set forth in this Complaint as if set forth herein.

172.     During Defendants' business relationship with Plaintiff, R.C. Bremer induced Cordes, Hostler, Sheppard, and Martin to acquire knowledge of Plaintiff's Customer Needs and Requirements.

173.     Plaintiff was entitled to place its trust and confidence in Cordes, Hostler, Sheppard, and Martin, and Plaintiff did rely on R.C. Bremer's faithfully performing its obligations consistently with its duties.

174.     R.C. Bremer had actual knowledge of Cordes, Hostler, Sheppard, and Martin's fiduciary obligations to Plaintiff.

175.     As a direct and proximate result of Defendant R.C. Bremer tortious inducement, Plaintiff has been and is being harmed, and faces risk of irreparable harm.

176.     R.C. Bremer's tortious inducement was unjustified.


**COUNT SIX**

**(Breach of Contract: R.C. Bremer)**


177.     Plaintiff repeats and re-alleges each of the factual allegations set forth in this Complaint as if set forth herein.

178.     R.C. Bremer had an enforceable agreement with Plaintiff.

179.     R.C. Bremer  breached its contract with Plaintiff by the unlawful actions and/or conduct discussed above.

180.     Plaintiff performed all obligations pursuant to its contract with R.C. Bremer

181.    As a direct result of R.C. Bremer's breach of its contract with Plaintiff, Plaintiff has been damaged  in an amount of damages to be proven at trial.

**COUNT SEVEN**

**(Defamation as to R.C. Bremer, Cordes, and Sheppard)**

182.    Plaintiff repeats and realleges all the factual allegations of the Complaint as if set forth at length herein.

183.    Defendants have made false statements with a reckless disregard for their truth or accuracy to third-parties with which Plaintiff does business that relate directly to the Plaintiff's ability to conduct its business with such third parties.

184.    Plaintiff has been harmed, presumptively, under the law, and by such statements through the loss of reputation, goodwill and current and future business.

**COUNT EIGHT**

**(Intentional Interference with Contract): R.C. Bremer and Cordes**

185.    Plaintiff repeats and realleges all the factual allegations of the Complaint as if set forth at length herein.

186.    As its long-standing sales agent, R.C. Bremer knew of the longstanding contracts that the Plaintiff had with its customers.

187.    R.C. Bremer maliciously interfered with such contracts by the actions and conduct discussed above.

188.    Plaintiff has been harmed by the unlawful conduct of R.C. Bremer described above, in fact, by loss of business (including, but not limited to, the lost profits from the various customers discussed herein), as well as loss of goodwill and reputation which required tangible expenditure to rehabilitate Groves' brand.

189.     As its former SVP of Operations during the period that Groves had its contractual relationship with its detergent and surface cleaner supplier, Cordes knew of the longstanding contract that the Plaintiff had with that supplier.

190.     Cordes maliciously interfered with such contracts with that supplier by the unlawful actions and conduct discussed above.

191.     Plaintiff has been harmed by the unlawful conduct described above, in fact, by loss of business (including, but not limited to, the lost profits), as well as loss of goodwill and reputation which required tangible expenditure to rehabilitate Groves' brand.

**COUNT NINE**

**(FRAUD): R.C. Bremer**

192.     Plaintiff repeats and realleges all the factual allegations of the Complaint as if set forth at length herein.

193.     R.C. Bremer had been, and at all salient times up until the middle of March 2022, held itself out to be Groves' sales agent.

194.     Groves was led to believe R.C Bremer acted on behalf of Groves to solicit customers and orders for Groves in various territories throughout the United States.

195.     Groves used R.C. Bremer as its primary sales and marketing arm for a 25-year period, commencing in 1996, and accordingly relied upon R.C. Bremer to develop, and maintain, existing customer relationship as well as solicit new customer relationships and orders.

196.     Groves trusted and confided in R.C. Bremer to fulfill that function for it; and that function had been a material component of Groves' sales and marketing, and therefore, material to its overall business function.

197.     Groves' Vice President of Marketing and Sales, in December 2021, had been told, explicitly, and repeatedly, by R.C. Bremer (particularly, Joseph Falk and others at R.C. Bremer) that R.C. Bremer had been authorized to act as Groves' sales agent; that RCB would diligently solicit orders of Groves' Product from Groves' existing and prospective customers located in the Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, West Virginia, West Pennsylvania, and Wisconsin; that R.C.Bremer would only use Groves' Customer Needs and Requirements on behalf of and for the benefit of Groves.

198.     Groves' President and Vice President of Sales, in January 2022, February 2022, as well as March 2022, had been told, explicitly, and repeatedly, by R.C. Bremer (particularly, Joseph Falk and others at R.C. Bremer) that R.C. Bremer had been authorized to act as Groves' sales agent; that RCB would diligently solicit orders of Groves' Product from Groves' existing and prospective customers located in the Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, West Virginia, West Pennsylvania, and Wisconsin; that R.C.Bremer would only use Groves' Customer Needs and Requirements on behalf of and for the benefit of Groves.

199.     The aforementioned representations were material to Groves, and Groves relied upon those representations, in that, Groves did not seek out alternative sales and marketing support for the Territories.

200.     ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

201.　██████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

202.　　However, up until on or about the middle of March 2022, RCB represented to Groves that it had been its sales agent; RCB represented that it would diligently solicit sales of Groves' Product to Groves' existing and prospective customers located in the Territory; RCB further represented to Groves that it would only use Groves' Customer Needs and Requirements on behalf of and for the benefit of Groves.

203.　　RCB made those misrepresentations with the intent that Groves rely on those statements, and particularly maliciously, such that Groves would continue to provide its Customer Needs and Requirements to RCB, which RCB intended to use (and ultimately did use) to support the sales and marketing efforts of CAC, Groves' primary competitor.

204.　　RCB, similarly, and particularly maliciously, intended that Groves rely on those statements such that Groves did not have the sales and marketing support to compete with CAC in the Territories.

205.　　RCB, similarly still, and particularly maliciously, intended that Groves rely on those statements such that RCB could, with Groves' Customer Needs and Requirements and leaving Groves' unknowingly without marketing and sales support.

206.    All of this, of course, made it easier for RCB to solicit orders for CAC in the Territories for CAC products, instead of Groves, which RCB needed to do in order to receive ███ ███ commission rates offered by CAC, as well as quarterly, and annual, incentives offered by CAC.

207.    RCB made these misrepresentations knowing that they were not true.

208.    Because of Groves 25-year history of reliance on those <u>exact</u> **affirmative** representations, Groves reasonably believed that RCB had been fulfilling all such representations up until the middle of March 2022.

209.    Groves' reliance on the misrepresentations, therefore, were reasonable.

210.    But for those misrepresentations, Groves would never have continued to rely upon RCB to render sales for it; would never have provided RCB with continued access to its Customer Needs and Requirements; and would have immediately sought to enjoin any use of such Customer Needs and Requirements.

211.    **But RCB lied to Groves. While still under contract with Groves to act as its sales agent**, RCB, *inter alia*, sought to introduce CAC to all Groves' customers with whom CAC did not have prior relationships (or, only marginal prior relationships); cause those Groves customers to transfer their business from Groves to CAC by leveraging RCB's knowledge of Groves' Customer Needs and Requirements for the benefit of CAC; and assist CAC in launching new product lines, including, but not limited to, storage systems and racking to compete with Groves.

212.    RCB used Groves' Customer Needs and Requirements to market, and sell, CAC products to the marketplace.

213.    RCB received a ███████ commission rate from CAC than that offered by Groves as well as, upon information and belief, annual and quarterly incentives.

214.    Said another way, RCB profited handsomely from its betrayal of Groves. Groves, for its part, did not know that its products were not only _not_ being marketed by RCB, but that RCB was using Groves' Customer Needs and Requirements to market and sell CAC competitive products in the Territories to _all_ Groves' customers.

215.    To the contrary, Groves had been severely damaged. Because of the foregoing scheme, Groves presently can state that it lost significant sales from the following customers, during the period between the year-end 2021 to year-end 2022: 911 Fleet & Fire Equipment, Air One Equipment, Inc., Alex Air Apparatus, Alexis Fire Equipment, MacQueen Emergency Group, Associated Fire Safety, Banner Fire Equipment, Clarey's Safety Equipment, Dinges Partner Group LLC, Donley Safety, Ed M. Feld Equipment Co., Fire Master Equipment Inc., Fire Safety USA Inc., Five Alarm Fire & Safety, Heiman Incorporated, Jefferson Fire and Safety, Phoenix Safety Outfitters, Pomasl Fire Equipment, Vogelpohl Fire Equipment, MES-Illinois, Sentinel Emergency Solutions, W.S. Darley & Company, Witmer Public Safety Group, the Public Safety Store, Apollo Fire Equipment, American Airworks,  Dakota Fire Extinguishers, A.E.C. Fire & Safety, Columbus Supply, Conrad Fire Equipment, Danko Emergency Equipment, Fire Department Service and Supply Co., Fire Force Inc., Fire Service, Inc., First Due Supply Company, Fyr-Tek Inc., Grand Forks Fire Equipment, Hoosier Fire Equipment, John M. Ellsworth Co., Leo M Ellebracht Company, M&T Fire and Safety Inc., Oshkosh Fire & Police Equipment Inc., Conway Shield, The Fire House, Van Wert Fire Equipment, Weis Fire & Safety Equipment, LLC, MES-Illinois, Warren Fire Equipment, Mars Supply, Midwest Storage Solutions Incorporated, Allied Fire Sales & Service, Hook & Ladder Fire Rescue Products, LLC, Heritage Fire Equipment, Allegiant Emergency Services, Five Alarm Fire & Safety, MacQueen Emergency Group, Great Lakes Specialty Equipment, and FireService Management LLC.

**COUNT TEN**

**(COMMON LAW TRADE DRESS INFRINGEMENT): R.C. BREMER**

**Lanham Act §32, 15 U.S.C. §1125 (a)**

216.     Plaintiff repeats and realleges all the factual allegations of the Complaint as if set forth at length herein.

217.     Plaintiff is the owner of the valid and valuable common law trade dress.

218.     Defendant had actual knowledge of Plaintiff's ownership of and rights in its common law trade dress, at least as early as 2005 through their relationship with the Plaintiff.

219.     Defendant used Plaintiff's pictures containing Plaintiff's trade dress during a sales presentation to Groves' customer (*i.e.*, a fire and safety industry distributor) without authorization or consent of the Plaintiff.

220.     Defendant used, and upon information and belief, continue to use, the Plaintiff's unregistered trade dress in commerce, and in connection with the advertising, offering for sale, distribution, and sale of its goods; or otherwise in a profit generating manner.

221.     Defendant offered their goods under the infringing trade dress to one of Plaintiff's existing customers at the time.

222.     Defendant offered their goods under the infringing trade dress in the same channels of trade as those in which the Plaintiff's legitimate goods are offered.

223.     Defendant's use of the Plaintiff's unregistered trade dress is a reproduction, counterfeit, or colorable imitation of Plaintiff's trade dress in connection with Defendant's goods and services.

224.     Defendant has acted willfully and deliberately.

225.    Defendant has profited and have been unjustly enriched by sales that Defendants would not otherwise have made but for their unlawful conduct.

226.    Defendant's egregious and intentional, wide, public use, without the consent or authorization of the Plaintiff, has caused confusion and deception for consumers, and is likely to continue to cause confusion, or to cause mistake, or to deceive the public, in violation of the Lanham Act 15 U.S.C. § 1125(a)

227.    Plaintiff has been, and will continue to be, harmed by Defendant's conduct in an amount to be determined at trial, while the Defendants have been unjustly enriched.

**COUNT ELEVEN**

**(UNFAIR COMPETITION): R.C. BREMER**

Lanham Act §43(a), 15 U.S.C. § 1125(a)

228.    Plaintiff repeats and realleges all the factual allegations of the Complaint as if set forth at length herein.

229.    Defendant has not been authorized to use any of the Plaintiff's trade dress.

230.    By using the Plaintiff's pictures containing Plaintiff's trade dress during a sales presentation to Plaintiff's then existing customer, Defendant used Plaintiff's common law trade dress in commerce, in connection with the sale, offering for sale, distribution, or advertising of Defendant's goods and services.

231.    Defendant's words, terms, names, symbols, and devices are likely to cause confusion, mistake, or to deceive as to the affiliation, connection, or association with Plaintiff and Plaintiff's trade dress, its goods and services, and consumer confusion as to the origin, sponsorship, or approval of their goods and services by Plaintiff.

232.    Defendant's acts are causing and continue to cause irreparable harm to the Plaintiff in loss of control over its reputation, loss of sales, and loss of substantial consumer goodwill.

233.    Plaintiff has been and will continue to be harmed by Defendant's conduct in an amount to be determined at trial, while the Defendant has been unjustly enriched.

## COUNT TWELVE

## (FALSE DESIGNATION OF ORIGIN):  R.C. BREMER

15      U.S.C. § 1125(a)

234.    Plaintiff repeats and realleges all the factual allegations of the Complaint as if set forth at length herein.

235.    Defendant had direct and full knowledge of the Plaintiff's prior use of the trade dress dating back, at least, to 2005.

236.    Defendant intentionally and willfully copied Plaintiff's pictures containing Plaintiff's trade dress into their own sales presentation and further inserted their own watermarks to denote that the pictures belong to them.

237.    Defendant's use of the trade dress, without the Plaintiff's consent or authorization have caused and/or are likely to cause confusion or mistake, or to deceive consumers regarding the source, sponsorship, and or affiliation of the goods sold by the Defendant.

238.    Defendant has acted willfully and deliberately, has profited, and has been unjustly enriched by sales that would not otherwise have made but for their unlawful conduct.

239.    Defendant had direct and full knowledge of the Plaintiff's prior use of and rights in its mark before the Defendant committed their above acts.

240.    This knowing, intentional, and willful nature of the conduct renders this an

exceptional case under 15 U.S.C. § 1117(a).

241.    Plaintiff has been and will continue to be harmed by Defendant's conduct in an amount to be determined at trial, while the Defendant have been unjustly enriched.

**COUNT THIRTEEN**

**(PALMING OFF): R.C. BREMER**

15      U.S.C. § 1125(a)


242.    Plaintiff repeats and realleges all the factual allegations of the Complaint as if set forth at length herein.

243.    Defendant had direct and full knowledge of the Plaintiff's prior use of the trade dress dating back, at least, to 2005.

244.    Defendant's uses of the trade dress, without the Plaintiff's consent or authorization have caused and/or are likely to cause confusion or mistake, or to deceive consumers regarding the source, sponsorship, and or affiliation of the goods sold by the Defendant.

245.    Defendant has acted willfully and deliberately, have profited, and have been unjustly enriched by sales that would not otherwise have made but for their unlawful conduct.

246.    Defendant had direct and full knowledge of the Plaintiff's prior use of and rights in its trade dress before the Defendant committed their above acts.

247.    This knowing, intentional, and willful nature of the conduct renders this an exceptional case under 15 U.S.C. § 1117(a).

248.    Plaintiff has been and will continue to be harmed by Defendant's conduct in an amount to be determined at trial, while the Defendant has been unjustly enriched.

**COUNT FOURTEEN**

**(FALSE ADVERTISING): R.C. Bremer**

15      U.S.C. § 1125(a)

249.    Plaintiff repeats and realleges all the factual allegations of the Complaint as if set forth at length herein.

250.    Defendant had direct and full knowledge of the Plaintiff's prior use of the trade dress dating back, at least, to 2005.

251.    Defendant's uses of the trade dress, without the Plaintiff's consent or authorization have caused and/or are likely to cause confusion or mistake, or to deceive consumers regarding the source, sponsorship, and or affiliation of the goods sold by the Defendant.

252.    Defendant has acted willfully and deliberately, have profited, and have been unjustly enriched by sales that would not otherwise have made but for their unlawful conduct.

253.    Defendant had direct and full knowledge of the Plaintiff's prior use of and rights in its mark before the Defendant committed their above acts.

254.    This knowing, intentional, and willful nature of the conduct renders this an exceptional case under 15 U.S.C. § 1117(a).

255.    Plaintiff has been and will continue to be harmed by Defendant's conduct in an amount to be determined at trial, while the Defendant has been unjustly enriched.

**COUNT FIFTEEN**

**(ILLINOIS UNFAIR COMPETITION): R.C. Bremer**

765      ILCS 1036/60(a)

256.     Plaintiff repeats and realleges all the factual allegations of the Complaint as if set forth at length herein.

257.     As a result of its unauthorized use, RCB's use is likely to cause confusion or mistake or to deceive the public, in violation of the common law of the State of Illinois, as to the source of origin of such goods.

258.     RCB is likely to mislead and to continue to mislead prospective consumers as to an affiliation, connection, or association of Plaintiff's  goods Plaintiff has been and will continue to be harmed by RCB's conduct in an amount to be determined at trial.

**COUNT SIXTEEN**

**(ILLINOIS DECEPTIVE TRADE PRACTICES): R.C. Bremer**

815     ILCS 510/3


259.     Plaintiff repeats and realleges all the factual allegations of the Complaint as if set forth at length herein.

260.     As alleged above, RCB caused a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of their services.

261.     RCB disparaged the goods and business of the Plaintiff by false or misleading representation that RCB  is  affiliated with or sponsored or approved by  Plaintiff, in violation of the Illinois Deceptive Trade Practices Act, 815 ILCS 510/3.

262.     Plaintiff has been and will continue to be harmed by RCB's conduct in an amount to be determined at trial.

**COUNT SEVENTEEN**

**(BREACH OF FIDUCIARY DUTY): SHEPPARD**

263.     Plaintiff repeats and realleges all the factual allegations of the Complaint as if set forth at length herein.

264.     During his tenure with the Plaintiff, Defendant Sheppard served as officers of Plaintiff, and accordingly, maintain a fiduciary obligation to the Plaintiff to act in the best interest of the plaintiff, and not to act in a manner that conflicts with that of the plaintiff.

265.     Defendant Sheppard owed Plaintiff a duty of loyalty and were obligated to act with the utmost good faith, and in the best interest of Plaintiff.

266.     Plaintiff was entitled to place its trust and confidence in Defendant Sheppard and Plaintiff did rely on Sheppard in faithfully performing his obligations consistent with his duties.

267.     Sheppard's duty of loyalty to disavow any corporate opportunity to disavow any corporate opportunity where their interest conflicted with that of Plaintiff; Sheppard could not usurp a corporate opportunity of the Plaintiff for his own benefit and/or to the exclusion of plaintiff.

268.     Defendant Sheppard executed the Groves' Employee Handbooks, which reads: "Groves Incorporated requires that an employee's activities and conduct away from the job must not compete with, conflict with, or in any other way compromise company interests or adversely affect an employee's job performance and the ability to fulfill all job responsibilities. Groves Incorporated considers itself your primary employer and requires you to devote full attention to your job each workday" and "Upon termination, all… company property must be returned."

269.     Despite the foregoing obligations under the law, and specific to the Groves' handbooks, Sheppard violated his fiduciary obligations to the Plaintiff by the unlawful conduct detailed above.

270.    As a direct and proximate cause of Sheppard's breaches of fiduciary obligation to the Plaintiff, Plaintiff has been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully request that this Court:

A.  Award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiff is entitled;

B.  Award pre-judgment interest and post-judgment interest on such monetary relief;

C.  Award reasonable attorneys' fees and costs; and

D.  Grant such further relief as this court deems just and proper.

Respectfully submitted,

GROVES INCORPORATED, *Plaintiff*

October 12, 2023

/s/ David Graff
David Graff, Esq.-Admitted *Pro Hac Vice*
Graff Silverstein LLP
3 Middle Patent Road
Armonk, New York 10504
(212) 381-6055
dgraff@graffsilversteinllp.com
*Attorneys for Plaintiff Grove Incorporated.*

/s/ Eric D. Kaplan
Eric D. Kaplan (ekaplan@kpglaw.com)
KAPLAN & GOURNIS, P.C.
180 N. LaSalle Street
Suite 2108
Chicago, Illinois 60601
Phone: (312) 726-0531
Fax:    (312) 726-4928
*Attorneys for Plaintiff Grove Incorporated.*

## VERIFICATION

I, CHARLES NELSON, declares as follows:

1. I am the VP of Finance and Operation of Groves Incorporated.

2. I have personal knowledge of each and every fact alleged in this First Verified Amended Complaint (as redacted) and as stated herein in this Verification, and could competently testify if called as a witness, except for the facts alleged upon information and belief.

3. I declare, under penalty of perjury under the laws of the United States of America that the foregoing factual allegations are true and correct, except for the allegations made upon information and belief.

Executed this ___12___ th Day of October, 2023 at Woodstock, Illinois

Charles Nelson, Vice President
Groves Incorporated