IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Groves Inc.<br><br>    Plaintiff,<br><br>  v.<br><br>R.C. Bremer Marketing Associates Inc., *et al*.<br><br>    Defendants. | Case No.: 22-cv-50154<br><br>Judge Iain D. Johnston |

MEMORANDUM OPINION AND ORDER

Groves Inc. ("Groves") brought this First Amended Complaint ("Complaint") against R.C. Bremer Inc. ("Bremer"), and some present or former Bremer individuals ("the Bremer Individuals), alleging a host of claims in intellectual property, contract, and tort. Bremer and the Bremer Individuals jointly answered the Complaint. Bremer moved under F.R.C.P. Rule 12(c) for judgment on the pleadings regarding some claims against it. In the same motion, the Bremer Individuals moved for judgment on the pleadings regarding all claims against them. For the reasons below, the Court grants-in-part and denies-in-part Bremer's motion. It denies the motion from one of the Bremer Individuals (owner Jospeh Falk) but grants it as to the rest.

**Parties**

Plaintiff Groves is a fire and safety equipment wholesaler incorporated in Illinois. Dkt. 191 ¶ 19. Defendant Bremer is a "manufacturer's representative, selling industrial safety and fire equipment," based in Wisconsin and incorporated in Illinois. *Id.* ¶ 20. Defendant Joseph Falk is a Bremer owner. *Id.* ¶ 21. Defendants Christopher Soucek, David Reinke, David Ludwig, Jeffrey Alexander, Lisa Fox, Cody Gunter, Kimberly Falk, Jessica Robke, Brian Bond, Gregg Ladd, Mike Nochevich ("the Employees") are current or former Bremer employees. *Id.* ¶¶ 22–34. Both Parties group Falk and the Employees together, but they each use different terms to refer to them. The Court refers to that collective group as the "Bremer Individuals."

**Claims**

Groves alleges seventeen counts,[1] only some of which are relevant to this opinion. Counts I and II are trade secret misappropriation claims against both Bremer and

---

[1] Kitchen sink pleadings are not nearly as convincing, useful, or successful as their filers think. They are inconsistent with Rule 1 (and often Rule 11), unnecessarily jam up the

1

the Bremer Individuals. Count III is a claim for unjust enrichment also against Bremer and the Bremer Individuals.[2] Count V is a claim for tortious inducement of breach of a fiduciary duty; Count VI is a breach of contract claim; Count VIII is an intentional interference with contract claim. Counts V, VI, and VIII—along with nine other claims not discussed in Defendants' brief—are only against Bremer. The Bremer Individuals moved for judgement on the claims against it, i.e. Counts I, II, and III. Bremer only moved for judgment on Counts V, VI, and VII, i.e. not Counts I, II, III, nor those other nine.

**Background**

The Court takes the following allegations from Groves' Complaint as well as Groves' Response to Bremer's Motion for Judgment on the Pleadings.[3] The allegations are accepted as true for the purposes of deciding this Motion.

Sprinkled throughout a circuitous 270 paragraph Complaint (and twenty-four page Response), Groves' story is basically this: While acting as Groves' own sales agent, Bremer sabotaged and betrayed, stole and deceived. The details (as best collected) are as follows:

A forty-two year-old business, wholesaler Groves sells safety products to distributor customers in the fire and safety industry. *Id.* ¶ 38. Throughout that time, Groves kept track of its customers via customer databases and repositories. *Id.* ¶ 40. It collected basic information, like the customers' names and contact information, as well as data on the customers' purchases and sales volume, price points and needs, and the customers' impact on Groves' revenue and profits. *Id.* Groves "organized and culled" that data, drawing a "roadmap" to its customers and potential customers. *Id.* ¶ 41. Groves refers to these databases as its "Customer Needs and Requirements" ("CNR"). *Id.* ¶ 39.

The Company kept the databases under lock and key, employing double-password mechanisms, restricting access, and supervising employees' use. *Id.* ¶ 47. Groves

---

docket, slow the proceedings to a snail's pace, and obscure any meritorious claims or defenses among worthless clutter. *See Pursley v. City of Rockford*, No. 18-cv-50040, 2024 U.S. Dist. LEXIS 4205, at *4 n.1 (N.D. Ill. Mar. 11, 2024); *Moore v. Lauer*, No. 22-cv-50354, 2024 U.S. Dist. LEXIS 11673, at *2-3 (N.D. Ill. Jan. 23, 2024) ; *see also Lesorgen v. Mondelez Glob., LLC*, 674 F. Supp. 3d 459, 464 (N.D. Ill. 2023).

[2] Bremer moved for judgment on Count IV and Groves "concede[d] that it is no longer proceeding with it." Dkt. 276, pg. 6. So the Court dismisses Count IV.

[3] Groves' Response includes nine pages that restate (and sometimes revise) the Complaint's allegations. That's frustrating and far from best practices. However, the Seventh Circuit's caselaw gives plaintiffs flexibility in their briefing and permits consideration of elaborations that are consistent with the complaint. *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 248 (7th Cir. 2017). The Court finds that the relatively minor changes are just that.

also required employees to sign an employee handbook attesting that they "understand[] and acknowledge[] that the Confidential Information has been developed or obtained by the investment [of] significant time, effort, and expense, and that the Confidential Information is a valuable, special, and unique asset," providing a "significant competitive advantage and needs to be protected from improper disclosure." *Id.* ¶ 44. The Company barred disclosure or retention of confidential information after an employee's departure. *Id.* ¶ 48. Such security precautions are par for the course in Groves' industry. *Id.* ¶ 51.

As a wholesaler and manufacturer, Groves requires sales representatives to find, solicit and maintain business from distributors in the fire industry. That's where Bremer comes in. Back in 1996, Groves and Bremer signed a contract whereby Bremer agreed to be Groves' sales representative in a particular region in exchange for a set commission rate. *Id.* ¶ 6; Dkt. 276, pg. 4. [4] It allowed either party to end the relationship, so long as that party provided thirty-days' notice. Dkt. 276, pg. 4; dkt. 263, ex. A. The three-page agreement articulated little else, containing no discussion regarding confidentiality. *See* Dkt. 263-1 ex. A. However, at some point, the two companies "had communications about the manner and method" by which Bremer would handle Groves' information. Dkt. 191 ¶ 55. Specifically, Bremer agreed to keep all customer information "strictly confidential" and use it only for Groves' benefit. *Id.* ¶¶ 55–58. For twenty-five years, Bremer and Groves enjoyed a "long and profitable" relationship. *Id.* ¶ 7.

And though their contractual relationship would formally survive through March 14, 2022, things changed starting in November 2021. *Id.* ¶ 61. Around that time, CirculAir Corporation ("CAC"), Groves' "most significant competitor," *id.* ¶ 7, launched an aggressive campaign against Groves. Over the next few months, CAC poached Groves' President, Brent Hostler, its VP of Marketing and Sales, Thomas Martin, and its Senior VP of Operations, Juliann O'Toole Cordes. *Id.* ¶¶ 69–70. It purchased Groves' products to develop "copycat" versions. *Id.* ¶ 61. It lured Groves' customers with promises of lower prices on replicated products. *Id.* ¶¶ 96–97. What's more, it pitched a Groves customer using an image of a Groves invention but doctored with a CAC logo. *Id.* ¶¶ 101–03.

Groves alleges that Bremer, while still Groves' own sales representatives, played a decisive role throughout CAC's campaign. *Id.* ¶ 11. In November and December 2021, CAC and Bremer were in "negotiations" for Bremer to become CAC's sales

---

[4] Groves did not identify the underlying contract in its Complaint. Bremer attached the 1996 agreement as an exhibit to its motion. Dkt. 263, ex. A. Groves then cited the contract in its response. As Bremer urges, the Court considers the exhibit without applying a summary judgment standard, because the contract is referenced in and central to Groves' Complaint. *See Hecker v. Deere & Co.*, 556 F.3d 575, 582–83 (7th Cir. 2009).

representative, *id.* ¶¶ 61, 64, CAC promising higher commissions and other incentives. *Id.* ¶ 13; dkt. 276, pg. 5.[5]

Those negotiations were successful: in December CAC and Bremer executed a "Manufacturers Sales Agent Agreement," which made Bremer CAC's sales representative in the territories where Groves operated. Dkt. 191 ¶¶ 83–84; dkt. 276, pg. 9. The agreement demanded that "Bremer will not act as sales or marketing representative or agent for any entity which produced and/or sells any competing goods or products to the Products produced and sold by [CAC]." Dkt. 191 ¶ 83; dkt. 276, pg. 9. Though Bremer, in signing that agreement, effectively contracted to *not* operate as any other competitor's agent, Bremer never revealed that limitation to Groves. Dkt. 191 ¶ 84; dkt. 276, pg. 9. Indeed, Bremer owner Falk, "explicitly and repeatedly" told a Groves executive that his company was "diligently" working on Groves' behalf. Dkt. 191 ¶¶ 81–82.

Bremer was also aware that Groves executives planned to depart for CAC, and nonetheless communicated with those executives about Groves' customers. *Id.* ¶¶ 64–69. Around November 24, 2021, Groves President Brent Hostler shared 2022 sales projections with Bremer to benefit Bremer and CAC. *Id.* ¶ 63. And on December 6, 2021, CAC's owner texted Bremer's, "Looking forward to getting the distractions out of the way and [Groves President] Brent [Hostler] and I being able to focus on growth with current and new products." *Id.* ¶ 64. In that same exchange, Bremer's owner confirmed that it received Groves' customer information and sales projections from Hostler for the "purpose" of using it on CAC's behalf. *Id.* ¶ 69. Hostler did not resign as Groves' President until December 10, 2021. *Id.* ¶ 66.

In January 2022, CAC's VP of Sales and Marketing (previously Groves') emailed Bremer's owner: "let's talk tomorrow on these accounts and plan to win them over (some or all?)." That email included an embedded screenshot from Groves' internal system listing twenty-one of its substantial customers. *Id.* ¶ 90. And in February Bremer worked on a PowerPoint that CAC used to poach a Groves customer. *Id.* ¶ 100. That PowerPoint included the image of a Groves product with a CAC logo. *Id.* ¶ 101. Because of Bremer, on or about March 3, a Groves customer signed a "large deal" with CAC. *Id.* ¶ 108; dkt. 276, pg. 6.

---

[5] In its Complaint, Groves redacts references to the higher commission rates and Bremer's exclusivity agreement with CAC. Dkt. 191 ¶¶ 13, 53–54. However, in its Response brief, Groves realleges—without redaction—those same claims. *See* dkt. 276, pg. 5 (noting "higher promised commissions"); *Id.*, pg. 9 (quoting the precise contract language it earlier redacted). As a result, the Court now considers those Complaint allegations voluntarily unsealed. In the future—and this ought to go without saying—if the material does not actually require redaction, Groves *should not* force the Court to wrestle with redactions.

4

But it wasn't until March 14 that Bremer ended its relationship with Groves. Dkt. 191 ¶ 111. That day, Bremer's owner wrote to Groves', "This email is to inform you that [Bremer] will no longer be representing [Groves]. This is effective from our original conversation on Tuesday, March 8." *Id.* Until then, Groves alleges, it believed Bremer was always working on Groves' behalf. *Id.* ¶ 112.

**Legal Standard**

When challenging the sufficiency of a complaint, a motion for judgment on the pleadings under Rule 12(c) is governed by the same standard as a motion to dismiss under Rule 12(b)(6). *Pisciotta v. Old Nat'l Bancorp.*, 499 F.3d 629, 633 (7th Cir. 2007). The complaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief. F.R.C.P. 8(a)(2). The complaint must give the defendant fair notice of what the claim is and the grounds upon which it rests. *Piscotta*, 499 F. 3d, at 633. Factual allegations must be enough to raise a right to relief above the speculative level. *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In assessing a motion for judgment on the pleadings, the court draws all reasonable inferences and facts in the nonmovant's favor. *Wagner v. Teva Pharms. USA, Inc.*, 840 F.3d 355, 358 (7th Cir. 2016). The court need not accept as true any legal assertions. *Id.* The nonmovant bears the burden of establishing a complaint's insufficiency. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020).

**Analysis**

    **A.    Bremer Individuals**

Groves sued twelve current or former Bremer Individuals: Groves lists eleven of them as "employees" and one, Joseph Falk, as an "owner." Groves alleges that all were involved in the misconduct, and both Parties' briefs treat the Individuals as a single unit. Groves, however, includes some specific allegations regarding Falk, but essentially none regarding the remaining eleven. The Court therefore divides the claims against the Individuals into two categories: 1) claims against the Employees, and 2) claims against Bremer owner Falk. It analyzes each in turn.

        **1)    Bremer Employees**

Groves sued eleven Bremer employees, alleging that all were involved in the misconduct. Bremer argues that, in indistinguishably naming numerous employees, Groves engages in improper "group pleading." But that argument is too broad, because—as frustrating and sloppy as it is— "group pleading is not per se improper." *Martinez v. Wexford Health Servs., Inc.*, 2021 U.S. Dist. LEXIS 75255 (N.D. Ill. Apr. 20, 2021). The underlying analysis is whether the complaint, as a whole, creates the plausible inference that each defendant is liable for the act complained of. If any group pleadings, taken along with any individual pleadings, create such a plausible

5

inference, then the complaint is sufficient and survives a Rule 12 motion. On the other hand, if the group allegations, combined with any individual allegations and reasonable inferences, fail to put a specific defendant on notice as to their alleged personal involvement in the injury, the plaintiff's complaint will not survive. *See Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed.").

Groves principally relies on two Northern District opinions to support its position that group pleading is appropriate in this case. Both are distinguishable.

In *RVassets LTD v. Marex Cap. Mkts. Inc.*, plaintiff sued a company and two of its employees—a total of three parties—alleging trade secret violations. 2024 U.S. Dist. LEXIS 80256, at *2–3 (N.D. Ill. May 2, 2024). The plaintiff alleged that one of the individual defendants had login credentials that gave access to the proprietary information, and that he shared a desk and worked near the other. *Id.*, at *7–8. The court also noted that defendants' brief indicated that defendants were "fully aware of the nature of [plaintiff's] allegations."

And in *Symbria, Inc. v. Callen*, plaintiffs sued a complicated web of "interrelated" corporate entities that shared "common management and employees," alleging that they all engaged in copyright infringement. 2022 U.S. Dist. LEXIS 2719, at *10 (N.D. Ill. Jan. 6, 2022). Though the plaintiffs "ha[d] not detailed each [d]efendant's specific misconduct," the court reasoned that "given [the] allegations of interrelated corporate structures," it was at least plausible that each entity was involved. *Id.*

In contrast, Groves sued eleven current and former Bremer employees, alleging that *all* of them unlawfully misappropriated trade secrets. As Bremer notes, all of these individuals appear only in the Complaint's "Parties" section. Groves does not identify their positions (beyond "employees"), let alone establish a link between the misappropriation and their individual involvement. This type of pleading fails. *See Knight*, 725 F.3d at 818 ("A contention that "the defendants looted the corporation"— without any details about who did what—is inadequate. Liability is personal. An allegation that someone looted a corporation does not propound a plausible contention that a particular person did anything wrong."). Indeed, we demand more from even *pro se* litigants. *See Potter v. Clark*, 497 F.2d 1206, 1207 (7th Cir. 1974).

That brings us to the consequences. In some instances, courts will permit a group-pleading plaintiff to file an amended complaint. *See e.g. Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001). This Court is not so inclined in this case. First, the Court granted months of expedited fact discovery. Unlike the ordinary procedural posture, Groves had the opportunity to develop some link to these individuals. And in any event, the Court effectively allowed an amendment when it accepted the revised

6

factual allegations in Groves' Response, which did nothing to further tie the individuals to the scheme. It's futile (and wasteful) to keep it going; the claims against the Employees are dismissed with prejudice.

### 2) Bremer's Owner

Groves' claims against Bremer's owner, Joe Falk, however, are sufficient. First a quick note: Groves brought claims I (DTSA), II (ITSA), and III (unjust enrichment)[6] against "All Defendants," i.e. Bremer and the Bremer Individuals. Though Bremer "vigorously disputes[s]" all the allegations, dkt. 263 pg. 2 fn. 2, the entity itself did not move for judgment on these misappropriation claims. It also never briefed whether the materials at issue constituted trade secrets and if so whether they were misappropriated. So the Court considers the trade secret misappropriation claims against Bremer sufficiently pled; the only question is whether any Individuals are linked to those claims. Regardless, the Court finds that Groves sufficiently pleads the elements of trade secret misappropriation.[7]

Unlike the Employees, Groves provides some specific allegations regarding Falk.[8] Groves claims that Bremer's "owner" communicated directly with Groves or CAC executives: Groves alleges that around December 6, 2021, "CAC's owner text messaged [Bremer's] owner" 'Looking forward to getting the distractions out of the way and [soon-to-be-ex-Groves-President] Brent [Hostler] and I being able to focus on growth with current and new products.'" Dkt. 162-1 ¶ 64. Hostler did not resign until December 10, 2021. *Id.* ¶ 67. And on January 11, 2022, CAC's newly appointed VP of Sales (formerly Groves' sales chief) emailed "[Bremer's] Owner," with a screenshot of Groves' customers and the message "Let's talk tomorrow on these accounts and plan to win them over (some or all?). *Id.* ¶ 90.

---

[6] The viability of Count III will be addressed by a separate order, requiring Groves to show cause why Count III shouldn't be dismissed as being preempted. *See ExactLogix v. Job Progress*, 508 F. Supp. 3d 254, 268–69 (N.D. Ill. 2020).

[7] The federal (DTSA) and Illinois (ITSA) trade secret definitions are "materially identical." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 549). To prevail on a claim, a plaintiff must ultimately show that the information constituted a trade secret that defendant misappropriated and used in its business. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003). Groves does that, plausibly alleging that at least some of its customer information could constitute a trade secret and that Bremer's unauthorized use constituted misappropriation.

[8] Groves doesn't explicitly say that Falk and the "owner" in these references are the same. However, the Court draws that very reasonable inference. First, Groves claims that Falk owned Bremer and does not list any other owner. Second, one allegation in the Complaint reads, "CAC's Owner wrote to [Bremer's] Owner 'Joe…'") ¶ 110. So that and other mentions of an owner presumably also refer to Mr. Joe Falk.

7

It's true that Groves only cites Falk's individual involvement (or even that of an "owner") a few times. Groves attributes the remaining allegations to "Bremer" or "the Bremer Defendants."[9] And if the allegations involved a complicated story, the Court might demand more. *See McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011) ("The required level of factual specificity rises with the complexity of the claim."). But Groves merely needed to allege "enough details about the subject-matter of the case to present a story that holds together." *Id.* (citing *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

Groves does that in this case. The allegations are straightforward: Bremer (through at least one person) had the means and the motive to unlawfully obtain Groves' proprietary information and misappropriate it. Given his position and the above communications, it's reasonable to infer that Falk was involved in the alleged trade secret misappropriation. Further, Bremer draws rigid lines distinguishing the company itself from its individual employees, seeking to dismiss the claims against the latter alone. But, in this case, that argument proves too much. Bremer would have the Court believe that the small corporate entity discovered proprietary information, stole it and used it to poach clients all without any human help. That story doesn't add up. Drawing on its common sense and the proffered allegations, the Court finds it plausible that the company's owner had some involvement in the alleged scheme. *See McCauley*, 671 F.3d at 616 ("Making the plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

So, to summarize: Count I, the federal trade secret claim (DTSA) and Count II, the Illinois state secret claim (ITSA) against the Employees are dismissed with prejudice. Groves may proceed with its ITSA and DTSA claims against Falk.

### B.     Bremer, Inc.

Bremer, Inc. moves for judgment on the pleadings as to three Counts: 1) tortious inducement of breach of fiduciary duty (Count IV), 2) breach of contract (Count VI), and 3) intentional interference with contract (Count VIII). The Court analyzes each in turn.

### 1)     Tortious Inducement of Breach of Fiduciary Duty

---

[9] Groves uses "Bremer" in its Complaint, and "the Bremer Defendants" in its Response. It presumably does so to counter Bremer's arguments that Groves failed to allege that any Individuals were involved. *See* dkt. 277, pgs. 3–6 ("Now recognizing its fatal mistake, Groves attempts to re-write the Amended Complaint in their brief by grouping the entity R.C. Bremer and the Individual R.C. Bremer Defendants as one unit collectively called the R.C. Bremer Defendants.").

To succeed on a claim in Illinois for tortious inducement of a breach of fiduciary duty, a plaintiff must show that a defendant "1) colluded with a fiduciary in committing a breach; 2) knowingly participated in or induced the breach of duty; and 3) knowingly accepted the benefits resulting from that breach." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007) (citing *Regnery v. Meyers*, 287 Ill. App. 3d 354, 364, 223 Ill.Dec. 130, 679 N.E.2d 74, 80 (1st Dist. 1997)). Liability requires a showing that defendant engaged in some "active misbehavior. *Borsellino*, 477 F.3d at 509; *see also Lansing v. Carroll*, 71 F. Supp. 3d 765, 770 n.7 (N.D. Ill. 2014) (quoting *In re Pritzker*, No. 02 CH 21426, 2004 WL 414313, at *7 (Ill. Cir. Ct. Mar. 5, 2004) ("[T]he parties [must know] or [have] reason to believe at the time of their alleged participation that the acts were wrongful.")).

A preliminary issue: Groves highlights former executives' misconduct occurring both before and after their departure. As then-corporate officers, Groves' President, Brent Hostler, its VP of Marketing and Sales, Thomas Martin, and its Senior VP of Operations, Juliann O'Toole Cordes owed Groves a fiduciary duty. But those duties apply only during an officer's employment and can't be breached based on purely post-employment activities. *See Griffin Asset Mgm't, LLC v. Clark*, 2023 U.S. Dist. LEXIS 170959 (N.D. Ill. Sept. 26, 2023) (citing *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F. 2d 1263, 1265 (7th Cir. 1992). So, Groves must ultimately show that Bremer induced the alleged breach while the officers were still Groves employees.

Groves plausibly alleges that. It claims that Bremer's negotiations with CAC—the company that would ultimately employ the Groves executives—began in November 2021, weeks before any executive left Groves. And on December 6, 2021, CAC's and Bremer's owners communicated about then-Groves President Hostler's forthcoming departure. Those discussions, coupled with Bremer's other alleged misconduct throughout this period, permit the reasonable inference that Bremer's inducement occurred while executives still owed Groves fiduciary duties.

Moving on. Groves appears to base its inducement claim on the allegation that Bremer persuaded certain executives to wrongly provide it with Groves' "Customer Needs and Requirements." As Bremer notes, Groves seems to contradict itself, sometimes indicating that Bremer had access to this "Customer Needs and Requirements" because of its sales relationship and sometimes indicating that Bremer induced Groves executives to obtain it. *See* dkt. 263, pgs. 14–15 (Defendants noting the inconsistencies). If it already had access to the "Customer Needs and Requirements," Bremer argues, the executives wouldn't breach a duty by disclosing the it and regardless, it wouldn't confer a benefit. Bremer contends that Groves therefore "plead its way out of a claim." In its Response, Groves argues that the "Customer Needs and Requirements" included other materials that Bremer hadn't

9

previously possessed. It added that Bremer also induced breach during the executives' pre-resignation planning activities.

The Court finds that Groves' Complaint, taken as a whole, plausibly alleges an inducement claim. True, Groves scatters relevant allegations throughout many paragraphs. And it poorly identifies the "Customer Needs and Requirements," sometimes construing it as a singular, composite database while other times indicating it's an amorphous term encompassing "myriad information." But the test isn't whether a plaintiff organizes its complaint well or perfectly anticipates all defenses; it's whether a plaintiff provides enough facts to state a plausible claim. *See Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012) (A complaint that invokes a recognized legal theory and contains plausible allegations on the material issues cannot be dismissed under Rule 12). Defendants' inapposite citation to a RICO case doesn't change this outcome.

Groves repeatedly alleges Bremer's involvement in certain executives' misconduct, all (or any) of which could potentially support an inducement claim. For example, a Groves executive shared Groves' 2022 sales projections with Bremer mere weeks before he departed for CAC. And, as discussed, Bremer was in negotiations with CAC around this time and knew the executive would soon leave Groves. Bremer fails to demonstrate that Groves' claims are insufficient.

### 2) Breach of Contract

Groves alleges a claim for breach of contract, but as Bremer notes in its Motion, Groves doesn't explicitly identify which contract Bremer breached or how it did so. Throughout the Complaint, however, Groves repeatedly refers to the Parties long-term, mutually beneficial relationship and the obligations it imposed. Dkt. 191, ¶ 6. And, in Groves' Response, it identified the Parties' 1996 "Sales Representative Agreement" ("Agreement") as the underlying contract. To the extent the identification constitutes an addition, the Court considers it a permissible elaboration.

In that three-page Agreement, "Groves appoint[ed Bremer] as sales representative" for a certain geographic area, and granted Bremer a set commission rate. The Agreement permitted either party to terminate the relationship, so long as the party provided thirty-days' notice. The Agreement was silent as to issues like the disclosure of proprietary information and exclusivity.

Bremer makes hay of the fact that the Agreement lacked an exclusivity clause, arguing that its relationship with CAC could therefore never constitute breach. But Bremer evades the main point: it signed an exclusivity agreement with Groves' primary competitor—effectively barring Bremer from soliciting sales on Groves' behalf—without ever informing Groves of that limitation. At this early stage, it's too

10

soon to determine the scope of the Parties' contractual relationship or its historical performance. But Groves raises a plausible claim that Bremer's agreement with CAC constituted a de facto breach.

Bremer also contends that Groves can't allege violation of the Agreement's thirty-day-notice clause for the first time in its Response. But as noted above, Groves' Complaint alluded to the contractual relationship and put Bremer on notice that it breached. Further, Bremer itself attached the Agreement to its Motion, and asked the Court to consider it because it was "central to the allegations," and because Groves submitted it with its initial complaint. Dkt. 263, pg. 3 fn 3. So Bremer had notice and Groves' additional contentions regarding the thirty-day clause are merely elaborations.

### 3) Intentional Interference with Contract

A claim for intentional interference with contract requires: 1) the existence of a valid and enforceable contract; 2) the defendant's awareness of the contractual relation; 3) the defendant's intentional and unjustified inducement of breach of the contract; 4) a subsequent breach by the third party; 5) resulting damages. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003) (citing *Hi-Tek Consulting Services, Inc. v. Bar-Nahum*, 218 Ill.App.3d. 836, 161 Ill.Dec. 347, 578 N.E.2d 993, 997 (1991)).

Groves' claim fails at element one. Groves alleged that Bremer knew of its "longstanding contracts," and that Bremer "maliciously interfered" with those contracts. Dkt 162-1, ¶¶ 185–86. In its 12(c) Motion, Bremer highlighted that Groves never alleged that it had contracts with any specific customers, let alone their terms. Dkt. 263, pg. 13. And despite a twenty-four page response, Groves still failed to provide any details regarding those agreements. Instead, repeating its conclusory allegations, it merely lists fifty-eight customers and claims it a) had contracts with all of them, and that b) they all breached.

To justify its specifics-free allegations, Groves relies on *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 871 (N.D. Ill. 2006).[10] That district court case is distinguishable and, in-fact, demonstrates some of the

---

[10] Groves also relies on *Record Data, Inc. v. Schoolcraft*, 1986 U.S. Dist. LEXIS 27113 (N.D. Ill. Apr. 7, 1986), an old case raising a different claim: tortious interference with business relations. The first element of that claim, which the opinion recites, requires the "existence of a valid business relationship (*not necessarily evidenced by an enforceable contract*)…" (emphasis added). In contrast, Groves' claim for tortious interference with contract, necessarily requires a contract's existence. *Cromeens*, 439 F.3d at 398. So *Schoolcraft* is inapposite. Given Bremer's extensive briefing on Groves' repeatedly articulated claim—coupled with Groves' many bites at the apple—the Court will not reconstrue it.

11

relevant details this Court looked for in Groves' claim. First, the *Diamond Blade* defendant "admit[ted]" that a contract with a third-party existed and that defendants interfered with it, *id.* at 871; Bremer does no such thing in this case. Further, that plaintiff specifically identified the contract (a restrictive covenant), that applied for a certain amount of time (12 years) and that governed relevant issues (nondisclosure and noncompete). *Id.* at 869. Groves does not allege when it entered into these agreements, their duration, or the limitations it imposed on its customers.

At this stage in the litigation, the Court can only doubt the contracts' existence (or if they exist that they impose any substantive limitation on the customers). Recall that *Groves* alleges that these are *Groves'* contracts with *Groves*' customers. So they should already be in Groves' possession such that it could articulate something more than conclusory statements. Yet despite months of fact discovery and the Court permitting Groves' lengthy response brief, Groves still proffers no information on the alleged contracts. The Court dismisses this interference with contract claim with prejudice.

**Counterclaim**

In its answer, Bremer counterclaimed for breach of contract, alleging that Groves failed to pay Bremer for services provided in January and February 2022. Dkt. 196, pg. 83. Groves' predicate contract claim remains, so the Court denies the Motion regarding the counterclaim.

**Conclusion**

For the above reasons the Court grants-in-part and denies-in-part Bremer's motion as follows: it grants the Motion as to Count VII, the intentional interference with contract claim. It denies the Motion as to Counts V and VI, the tortious inducement of breach of fiduciary duty and breach of contract claims, respectively. It denies the motion from one of the Bremer Individuals (owner Jospeh Falk) but grants it as to the rest. The Court discusses the viability of Count III in a separate order, requiring Groves to show cause why Count III shouldn't be dismissed as being preempted. It dismisses Count IV, the injunctive relief claim, because Groves and Bremer requested it.

Entered: October 16, 2024          By:_____
                                                                Iain D. Johnston
                                                                U.S. District Judge